# United States Court of Appeals
## For the First Circuit

---

No. 00-2031

UNITED STATES OF AMERICA,

Appellee,

v.

EDGARDO VELEZ-SALDANA,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

---

Before

Selya and Boudin, Circuit Judges,

and Schwarzer,* Senior District Judge.

---

Robert W. Odasz for appellant.
Aixa Maldonado-Quinones, Assistant United States Attorney,
with whom Guillermo Gil, United States Attorney, Jorge E. Vega-
Pacheco, Assistant United States Attorney, Chief, Criminal
Division, and Thomas F. Klumper, Assistant United States
Attorney, were on brief for the United States.

---

*Of the Northern District of California, sitting by
designation.

BOUDIN, Circuit Judge. The question on this appeal is whether the police had reasonable suspicion to stop, and (thereafter) probable cause to arrest, Edgardo Velez-Saldana. There are two chapters to the story: the first is the nighttime seizure of drugs, and the second is the arrest of Velez-Saldana the following morning. The pertinent facts are undisputed, save as indicated below.

Shortly after midnight on March 29, 1998, two police officers were patrolling near the Los Limones sector in the Guayama district of Puerto Rico. Guayama is on the south side of the island, and Los Limones is close to the water. San Juan, the capital, is about fifty miles north of Los Limones. The police describe Los Limones as an isolated and swampish area with many mangrove trees; the area is cut by alleyways and known to be used by drug smugglers.

At approximately 12:20 a.m., the police patrol spotted a minivan, with only its parking lights illuminated, edging onto the main road through such an alleyway. At the sight of the police car, the minivan's headlights flashed on, it accelerated, and a chase ensued. The police saw one person jump from the van and, shortly thereafter, the driver also jumped after losing

-2-

control.  Police searched the crashed van and found in it almost a thousand kilograms of cocaine.

At 3 a.m., the police arrested a man wearing clothes matching those worn by the first person who jumped from the van. However, when officers Jorge Guzman and Jose Melendez reported for work at the Guayama Police Station at 8:00 a.m. the next morning, the driver had still not been apprehended.  The two officers were told that the drugs had been seized in the Los Limones sector, that "some people" were under arrest, and that they should proceed to Los Limones to "provide support" to investigating units.

At about 8:30 a.m., as the two officers approached Los Limones, they spotted Velez-Saldana on foot coming out of a patch of mangroves.  The area was sparsely populated, and the officers did not recognize Velez-Saldana and believed that he was a stranger in the ward.  The officers pulled their car over to the roadside, and Melendez, exiting from the car, hailed Velez-Saldana.  Melendez was in uniform with his weapon holstered but visible at the time.  At the later suppression hearing, Melendez gave this description of what ensued.

Asked where he was from, Velez-Saldana answered that he came from San Juan; he said that he had been dropped off by a friend named "Danny" so that he could get some breakfast and

that his friend would return to pick him up.  Velez-Saldana did

not give his name and claimed to have no identification.

Melendez continued:

>        While I was asking him this question
> [how did he get there], while I was
> interviewing him I was able to notice that
> he was sweaty.  He was agitated.  He had
> pieces of the mangrove roots--when mangrove
> becomes wet, the roots emit some sort of
> black substance, so he had that on his
> chest.  In addition to that, I was able to
> see that the lower portion of his blue jeans
> was wet.  It appeared to be darker than the
> rest of the blue jean.
>
>        He tells me that he had come there to
> eat; however, the place that he came out of
> and where we saw him, where we had the
> intervention with him, is rather far from
> any establishment.  So all these elements,
> him being sweaty, having the mangrove
> residue, having his pants wet, and being far
> from away from a supposed store where he was
> going to buy some food, gave me a motive to
> determine that he might have been involved
> and that he could be one of the individuals
> that had escaped in the early morning hours
> when the drug shipment was seized.

In his own testimony at the suppression hearing,

Officer Guzman confirmed the gist of Melendez' testimony and

added one further element.  Guzman said that Velez-Saldana

asserted that he had come to Guayama from Barrio Obrero--a

district of San Juan (Melendez recalled that Velez-Saldana had

said Puerto Nuevo, a different part of San Juan)--and that he

had left Barrio Obrero at about 8 a.m.  Yet, at about 8:30 a.m.,

-4-

Melendez and Guzman had encountered Velez-Saldana at a place in Guayama about 45 miles from Barrio Obrero. Guzman regarded Velez-Saldana's statement as plainly implausible.

After questioning Velez-Saldana for ten to fifteen minutes, the officers arrested him and took him back to the police station. The police secured further evidence pursuant to the arrest, and based in part on this evidence, Velez-Saldana (with three others) was ultimately charged with one count of possessing with intent to distribute 959.3 kilograms of cocaine. 21 U.S.C. § 841(a)(1) (1994).

In September 1998, Velez-Saldana moved to suppress the evidence secured as a result of his arrest. The district court held a three-day hearing in March 1999, at which detailed testimony was taken from both arresting officers; Velez-Saldana did not testify. On July 30, 1999, the district court issued a lengthy decision refusing to suppress the evidence. In February 2000, Velez-Saldana entered a guilty plea, reserving the right to appeal from the denial of his motion to suppress. He was subsequently sentenced to a term of ten years' imprisonment.

On this appeal, Velez-Saldana's first challenge is to the initial stop. Without either reasonable suspicion or probable cause, the police are free to question a citizen in public so long as he is not detained against his will and

remains free to leave. Florida v. Bostick, 501 U.S. 429, 434 (1991). However, the government concedes that the police detained Velez-Saldana at the outset, initially engaging in a so-called Terry stop. Terry v. Ohio, 392 U.S. 1, 19-20 & n.6 (1968). The test for a Terry stop is whether there is "reasonable suspicion" that the person detained was engaged in criminal activity. Id. at 21-22.

Although a Terry stop cannot be justified merely by hunch or intuition, Terry, 392 U.S. at 21-22 & n.18, in this case the police did proffer specific, articulable facts that reasonably warranted halting and questioning Velez-Saldana at least briefly. The police saw him emerging from a remote mangrove swamp at 8:30 a.m. on a Sunday morning, not far from where a shipment of nearly a thousand kilograms of cocaine had been seized eight hours earlier. The area was sparsely populated and the officers had never seen this individual before.

The "suspicion" needed for a brief stop and questioning need not be severe, because the intrusion is so limited. United States v. Young, 105 F.3d 1, 7-8 (1st Cir. 1997). It is quite true, as Velez-Saldana's counsel ably argues, that there was nothing at the outset that directly linked Velez-Saldana with the crime. All the police had was a criminal incident, an

isolated location, an unfamiliar face, and a coincidence of time and location. But "suspicion" does not require a direct connection; it is enough that the police had specific reason to think that Velez-Saldana <u>may</u> have been connected to the crime. <u>See</u> <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417-18 (1981).

Velez-Saldana does not directly challenge the scope of the <u>Terry</u> stop, which must also be reasonable. <u>United States</u> v. <u>Sharpe</u>, 470 U.S. 675, 682 (1985). In all events, the nature of the questioning--basic inquiries as to who Velez-Saldana was and why he was in the neighborhood--appears reasonable. As to the length of the encounter, there is no bright-line rule, <u>id.</u> at 687-88, but ten to fifteen minutes, at least in the circumstances of this case, is within reasonable bounds. <u>Compare</u> <u>United States</u> v. <u>Owens</u>, 167 F.3d 739, 749 (1st Cir.), <u>cert. denied</u>, 528 U.S. 894 (1999); <u>United States</u> v. <u>Robinson</u>, 30 F.3d 774, 784-85 (7th Cir. 1994).

Alternatively, Velez-Saldana asserts that at the end of the interview, the police lacked probable cause to arrest him. Here, the matter is complicated by the fact that he challenges not only the ultimate probable cause determination, which we review <u>de novo</u>, but also certain of the factual findings by the district judge, which are reviewed only for clear error. <u>Young</u>, 105 F.3d at 5. Because the findings are

the predicate to any inference of probable cause, we begin with them.

In summing up the various circumstances that added up to probable cause, the district judge mentioned (among others) two that Velez-Saldana now contests: the judge said that Velez-Saldana had "refused" to give his name when initially questioned and that "he provided implausible information regarding the time it took him to get to where he was when he was detained"--a reference back to Guzman's testimony that the "defendant stated that he had come to Guayama from Barrio Obrero, and that he had left Barrio Obrero at about 8:00 a.m." Velez-Saldana asserts that the record does not show that he refused to give his name or that he claimed to have started from Barrio Obrero at 8:00 a.m.

We have read the testimony of both officers with some care and agree that the evidentiary issue is debatable in each case. What Melendez said about asking Velez-Saldana to identify himself is that he asked for Velez-Saldana's name and that Velez-Saldana "never gave it." As to what Velez-Saldana said about leaving from Barrio Obrero, Guzman did give the testimony that the district judge attributed to him; but our own reading of the transcript suggests that there may have been some

confusion on Guzman's part as to whether Velez-Saldana actually said that the 8:00 a.m. departure was from Barrio Obrero.[1]

Nevertheless, failing to give one's name after being asked by the police could in this case be viewed as a suspicious circumstance, even if there was no outright refusal. And Guzman testified explicitly to what the judge found as to when the defendant left Barrio Obrero; we have nothing more than suspicion that Guzman may have misunderstood what Velez-Saldana was saying. In neither case can we say that the district judge committed clear error, although we need not accept the characterization of Velez-Saldana's failure to give a name as a "refusal."

Accordingly, the facts available to the officers at the time of the arrest included the following: that a major drug shipment had been seized near the Los Limones mangrove swamp hours earlier and "some people" were under arrest; that not far from the scene of the drug seizure, a strange man walked out of the mangroves and looked as if he had been wandering in the swamp for some time; and that he had no identification, did not

---

[1]Guzman did say expressly that Velez-Saldana claimed to have left Barrio Obrero at 8 a.m.; but a reader of the transcript could infer that Velez-Saldana claimed only to have been left by his companion in the Los Limones area at around 8 a.m. and that Guzman was confused on this point.

provide his name when asked, and gave an unpersuasive account of his presence.

The question, then, is whether "an objectively reasonable police officer" would believe that Velez-Saldana was involved with the drug shipment, <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690 (1996), giving "due weight to inferences drawn from [the] facts" by the arresting officer. <u>Id.</u> at 699. Here, the timing and location were suspicious; Velez-Saldana was a stranger to the area; his appearance suggested that he had been wandering or hiding in the mangroves; and his manner and failure to account plausibly for his presence reinforced initial doubts. Viewing the matter <u>de novo</u>, we agree that the police had basis enough for an arrest.

<u>Affirmed</u>.