# United States Court of Appeals
## For the First Circuit

No. 02-1644

UNITED STATES OF AMERICA,

Appellee,

v.

NGAI MAN LEE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin and Bownes, Senior Circuit Judges.

Bjorn Lange, Assistant Federal Public Defender, for appellant.
Mark E. Howard, Assistant United States Attorney, with whom
Thomas P. Colantuono, United States Attorney, was on brief, for
appellee.

January 17, 2003

**SELYA**, **Circuit Judge**.  In this case, a jury convicted defendant-appellant Ngai Man Lee of, inter alia, possession of fifteen or more unauthorized credit cards (known in the statutory argot as "access devices").  On appeal, Lee argues that the district court erred in failing to require jury unanimity as to which fifteen credit cards he possessed.  The question is one of first impression at the federal appellate level. Upon reflection, we conclude that the district court appropriately rejected the proffered jury instruction.

The appellant also advances two other assignments of error, namely, (1) that the police officers who questioned and arrested him did so in derogation of his constitutional rights, and (2) that a prejudicial remark uttered at trial demanded the declaration of a mistrial (a course of action eschewed by the district court).  We reject, more easily, these assignments of error.  When all is said and done, we affirm the judgment below.

## I.  BACKGROUND

We sketch the factual background and the travel of the case.  We reserve a fuller discussion of particular facts for our analysis of the appellant's suppression claim.

On September 5, 2001 an employee of an emporium in Salem, New Hampshire reported an attempted credit card fraud.  Police officers responded to the shopping plaza where the store was located.  They eventually stopped, questioned, and arrested both

the appellant and a companion.  A total of twenty-two unauthorized credit cards were found in the companion's wallet, the van in which the suspects had been riding, and a dumpster adjacent to a nearby store.

In due season, a federal grand jury indicted both men. The companion pleaded guilty and his case is not now before us. The appellant maintained his innocence.  After a trial, a jury convicted him of use and attempted use of unauthorized access devices (count 1) and possession of fifteen or more such devices (count 2).[1] The district court imposed concurrent sentences of eighteen months' imprisonment and two years' supervised release. This appeal ensued.

## II.  ANALYSIS

We consider the appellant's claims of error in chronological order.  Thus, we start by discussing the district court's denial of the appellant's pretrial motion to suppress.  We then turn to the refusal to grant a mistrial.  Finally, we address the claim of instructional error.

### A.  **The Suppression Motion**.

In considering pretrial rulings on suppression of evidence, we review the district court's answers to questions of

---

[1]The applicable statutory sections proscribe conduct pertaining to unauthorized or counterfeit access devices. See 18 U.S.C. § 1029(a)(2)-(3), (b)(1).  For simplicity's sake, we refer here solely to unauthorized credit cards.

law de novo and its findings of fact for clear error. United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996); United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). The ultimate questions on which Fourth Amendment inquiries hinge — such as the reasonableness of a particular detention or the existence vel non of probable cause — engender plenary review. Ornelas v. United States, 517 U.S. 690, 697-98 (1996). Absent an error of law, we will uphold a refusal to suppress evidence as long as the refusal is supported by some reasonable view of the record. United States v. Campa, 234 F.3d 733, 737 (1st Cir. 2000).

The appellant's suppression claim is fact-specific. We recount the relevant facts as the trial court found them, consistent with record support. See United States v. Chhien, 266 F.3d 1, 8 (1st Cir. 2001). On the day of the arrest, Salem police received a report of possible credit card fraud at a Service Merchandise outlet. The store's manager related that a young Asian male had tried (but failed) to purchase a $2,300 wristwatch using not one but two platinum American Express cards ostensibly issued in the name of Zhi Lin. When the attempt failed, both the prospective purchaser and his cohort — an Asian man wearing a green shirt and light-colored pants — departed hurriedly and headed for the parking lot.

Officer John Joy responded to the call. Arriving on the scene, Joy's attention was drawn to a white van occupied by the

appellant and Manchu He.  The two men matched the broadcast description of the suspects.  Although the van was stopped in the parking lot, the appellant tried to pull it forward when Joy approached.  Finding the way obstructed, the appellant then put the van in reverse and shot back (almost running into Joy's police cruiser).  Concerned that the men were trying to flee, Joy blocked their path, turned on his blue lights, drew his firearm, and directed his canine companion to bark.  When Joy ordered them to step out of the van and show their hands, the men complied.  As soon as they did so, Joy re-holstered his weapon and silenced the police dog.

At that juncture, four more officers arrived.  Joy told the appellant why he had been stopped and assured him that he would be free to go if everything "turned out."  He then posed a series of questions to him.  At the same time, a second officer began interrogating He.  In due course, He gave the officer his wallet and granted him permission to withdraw four pinchbeck cards from within it.  When He admitted that the name on the cards — Zhi Lin — was not his, the police arrested him.

Meanwhile, Joy continued to converse with the appellant. When Joy noticed several shopping bags in plain view in the rear of the van, he inquired about them.  The appellant confirmed that the merchandise belonged to the two men and gave Joy permission to look for the corresponding receipts.  A cursory inspection failed to

reveal any receipts, and Joy arrested the appellant for receiving stolen property.

The appellant thereafter consented to a search of the van and waived his _Miranda_ rights. _See_ _Miranda_ v. _Arizona_, 384 U.S. 436, 475-79 (1966). The search proved fruitful: the police found a cache of fourteen credit cards hidden in two cigarette packs behind the driver's seat (some in the name of Zhi Lin and some in the name of Yun Wu Chen). They also recovered receipts for merchandise purchases totaling approximately $16,000. The receipts correlated with the goods found in the van and with the unauthorized credit cards.

That afternoon, an employee of a nearby store found in an adjacent dumpster another four unauthorized credit cards in the name of Yun Wu Chen, together with some identification documents (most of which bore the same name). The employee also reported that an Asian male had entered the store earlier that day but had left after a few minutes of casual conversation.

The appellant mounts a three-pronged challenge in a concerted effort to suppress the fourteen credit cards, the receipts, the merchandise, and statements that he made to the police. This challenge assails the constitutionality of the investigatory stop, the propriety of his arrest, and the lawfulness of the authorities' post-arrest activities. We deal with these matters sequentially.

1. **The Investigatory Stop**. Warrantless investigatory stops are allowable if, and to the extent that, police officers have a reasonable suspicion of wrongdoing — a suspicion that finds expression in specific, articulable reasons for believing that a person may be connected to the commission of a particular crime. Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Woodrum, 202 F.3d 1, 6-7 (1st Cir. 2000). In this case, the police officer relied on the information in the store manager's account, together with what he observed in the parking lot, to draw the inference that the appellant and his companion might be involved in the reported credit card fraud. The district court found this reliance reasonable and the inference of involvement logical. We agree. The two men not only were in the right place at the right time but also fit the suspects' descriptions. This collocation of circumstances plainly satisfied the reasonable suspicion standard for an initial Terry stop. See United States v. Velez-Saldana, 252 F.3d 49, 53 (1st Cir. 2001); United States v. Jones, 187 F.3d 210, 216-17 (1st Cir. 1999). After all, police officers ordinarily may employ minimally intrusive measures to effectuate legitimate investigatory purposes. See Whren v. United States, 517 U.S. 806, 809-10 (1996); Chhien, 266 F.3d at 6-10.

A lawful Terry stop may, of course, metamorphose into an overly prolonged or intrusive detention (and, thus, become unlawful). The appellant raises that specter. Here, however, as

in United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998), the passage of time brought with it new knowledge (e.g., the discovery of the bogus cards in He's wallet and the sighting of the newly acquired merchandise) that escalated the level of suspicion. These emergent developments amply justified the continued detention. Chhien, 266 F.3d at 9-10; Sowers, 136 F.3d at 27.

Contrary to the appellant's importunings, this is not a case in which the officers prematurely carried out a de facto arrest. Although there were five officers on the scene, that fact, without more, does not lead inexorably to a conclusion that a de facto arrest occurred. See, e.g., Zapata, 18 F.3d at 975-76; United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987). The evidence, taken as a whole, adequately supports the district court's finding that, during the interrogation in the parking lot, a reasonable person in the appellant's position would not have understood himself to be in custody. Thus, the investigatory stop did not mutate into the functional equivalent of an arrest. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984); Zapata, 18 F.3d at 975.

In arguing for a different result, the appellant relies heavily on our decision in United States v. Acosta-Colon, 157 F.3d 9 (1st Cir. 1998). But the stop that transpired here is cut from different cloth. Unlike the suspect in Acosta-Colon, id. at 18-20, the appellant was neither handcuffed nor confined. Moreover,

unlike the suspect in Acosta-Colon, id. at 17-18, the appellant was detained and questioned in a public place.  These distinctions are critically important in drawing the sometimes elusive line between permissible investigation and impermissible intrusion.  See Oregon v. Mathiason, 429 U.S. 492, 494-96 (1977); Zapata, 18 F.3d at 975-77.

To be sure, Joy did block the movement of the van and draw his firearm — but he did so for a specific, security-related reason:  he was faced with what appeared to be an attempt at flight.  This makes a world of difference.  See United States v. Taylor, 162 F.3d 12, 21 (1st Cir. 1998); see also Acosta-Colon, 157 F.3d at 18-20 (collecting cases).  In all events, actions such as unholstering a weapon and obstructing a vehicle's path do not, as a matter of law, transmogrify an otherwise lawful Terry stop into a de facto arrest.  See, e.g., United States v. Trueber, 238 F.3d 79, 94 (1st Cir. 2001); Quinn, 815 F.2d at 156-57.  In this instance, the totality of the circumstances adequately supports the district court's finding that the stop lacked the coercive element necessary to convert it into something more draconian.

That ends this aspect of the matter.  The district court could, perhaps, have found the facts differently — but it is not our proper province either to speculate about whether the police officers' methods might possibly have been more genteel or to second-guess the district court's assessment of the evidence.  See

United States v. Sharpe, 470 U.S. 675, 686-87 (1985).  Mindful of these constraints, we uphold the lower court's binary determination that reasonable suspicion adequately justified the investigatory stop from its inception and that the ensuing detention was sufficiently restricted in its scope to satisfy applicable constitutional limitations.

      **2.**  **The Arrest**.  The appellant next challenges the legality of his arrest.  His challenge depends upon the existence vel non of probable cause.

      Probable cause is a fluid concept.  Its existence must be evaluated under the entirety of the circumstances.  Illinois v. Gates, 462 U.S. 213, 232 (1983); United States v. Figueroa, 818 F.2d 1020, 1024 (1st Cir. 1987).  Probable cause to arrest does not demand either the same quantum of proof or the same degree of certitude as a conviction.  Probable cause does, however, require reasonably trustworthy information such as would lead a prudent person to believe that the suspect likely had committed or was committing a criminal offense.  See Beck v. Ohio, 379 U.S. 89, 91 (1964); United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999).

      Probable cause often accretes gradually as an investigation progresses.  So it was here:  we agree with the district court that the circumstances giving rise to reasonable suspicion (recounted above) and the developments that unfolded

-10-

during the <u>Terry</u> stop furnished probable cause for the appellant's arrest.

The appellant protests that he was arrested primarily because his companion, He, was found in possession of unauthorized credit cards. While it is true that a person's "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause," <u>Ybarra</u> v. <u>Illinois</u>, 444 U.S. 85, 91 (1979), there is a considerable difference between mere propinquity and culpable propinquity. This is a case in which culpable propinquity logically could be inferred.

We rehearse the sequence of events. The store manager had reported that two Asian men had entered his establishment in connection with an attempted credit card fraud. The police discovered the appellant in the immediate vicinity of the failed attempt, driving a van that contained a large quantity of expensive, newly acquired merchandise. The man riding with him was found to be in possession of unauthorized credit cards (for which he was arrested). To cinch matters, the two men were not merely near one another but were traveling companions who satisfied the store manager's descriptions and who — by the appellant's own prearrest admission — jointly possessed the newly acquired merchandise. Under those circumstances, it strains credulity to think that the appellant was unaware that such a large quantity of

goods had been obtained through fraud.[2]  Cf. United States v.

Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (noting that "criminals

rarely welcome innocent persons as witnesses to serious crimes and

rarely seek to perpetrate felonies before larger-than-necessary

audiences").

The short of it is that, as the investigation progressed,

the arresting officer developed increasingly good reason to believe

that substantially more than a momentary, random, or innocent

association existed between the appellant and He (and, thus,

between the appellant and the suspected criminal activity).

Consequently, we uphold the district court's finding that

reasonable suspicion ripened into probable cause, thereby supplying

a sound constitutional basis for the ensuing arrest.  See Velez-

Saldana, 252 F.3d at 53; United States v. Martinez-Molina, 64 F.3d

719, 727-30 (1st Cir. 1995).

**3.  Post-Arrest Actions**.  Finally, the appellant suggests

that the search of his van was beyond the constitutional pale.

This suggestion lacks force.

The search was conducted pursuant to the appellant's

explicit consent, both oral and written.  If that consent was

---

[2]That the police arrested the appellant for receiving stolen
goods rather than for an attempted credit card fraud is of no
moment.  What counts is that probable cause existed, whether for
the charge actually prosecuted or for some other offense that
justified full custodial detention.  See United States v. Bizier,
111 F.3d 214, 218 (1st Cir. 1997).

valid, the search was not proscribed under the Fourth Amendment. See Schneckloth v. Bustamonte, 412 U.S. 218, 227-29 (1973); Woodrum, 202 F.3d at 8, 10-11. Although the appellant claims that his consent was vitiated by coercion and lack of comprehension, the facts of this case do not support that extravagant claim.

The record is bereft of any evidence that the police acted in a false or unduly coercive manner when they obtained the appellant's consent to the search. In arguing for a contrary conclusion, the appellant points principally to the fact that the police informed him that, if he did not consent to a search of the van, they would simply secure a warrant. Courts have held, with a regularity bordering on the monotonous, that this sort of statement, made in a case in which the facts were sufficient to support the issuance of a search warrant, does not constitute coercion. E.g., Bumper v. N. Carolina, 391 U.S. 543, 549 & n.14 (1968) (collecting cases); United States v. Perez-Montanez, 202 F.3d 434, 438-39 (1st Cir. 2000).

The record is equally inhospitable to the appellant's claim that he lacked comprehension. While we appreciate that English is the appellant's second language and that he had the assistance of an interpreter at trial, he has resided in the United States for many years. Perhaps more important, there is nothing in the record to indicate that the appellant was unable to understand Joy's questions, that he had any difficulty in communicating with

-13-

the officers at the scene (or afterwards for that matter), or that he had any problem comprehending the consent form. These circumstances undermine the credibility of any claim that lack of comprehension led him down a primrose path. See United States v. Abdullah, 162 F.3d 897, 902 (6th Cir. 1998); United States v. Yusuff, 96 F.3d 982, 986 (7th Cir. 1996).

We add one final flourish. The appellant previously had been convicted on other charges (e.g., possession of stolen property). That circumstance indicates that he had direct, first-hand experience with law enforcement and militates against a finding that he lacked full comprehension of the officers' request to search the vehicle. See United States v. Barnett, 989 F.2d 546, 556 (1st Cir. 1993); United States v. Cruz Jimenez, 894 F.2d 1, 8 (1st Cir. 1990). For all of these reasons, we accept the district court's determination that the appellant's consent to the search was lawfully obtained.[3] See Schneckloth, 412 U.S. at 248-49; Chhien, 266 F.3d at 8.

The appellant also contends that his Miranda waiver and the post-arrest questioning that followed were beyond constitutional limits. Because this contention rests on the same grounds as his plaint about the supposed invalidity of the

---

[3]Given this determination, we need not address the government's alternative arguments that the search was lawful under the automobile exception to the warrant requirement or as an inventory search. For the same reason, we need not consider the applicability of the doctrine of inevitable discovery.

-14-

vehicular search, we reject it out of hand. Accordingly, we uphold the district court's determination that the post-arrest questioning was neither unduly coercive nor tainted by lack of comprehension.

**4.  Recapitulation**.  We summarize succinctly.  We conclude that the police officer who stopped and questioned the appellant had reasonable suspicion for doing so; that the scope of the stop was within appropriate limits; that by the time the police arrested the appellant, reasonable suspicion had burgeoned into probable cause; and that the appellant knowingly and voluntarily consented both to a search of the van and to post-arrest questioning.  Consequently, we hold that the lower court did not err in denying the appellant's motion to suppress.

**B.  The Mistrial Motion**.

We turn next to the appellant's assertion that the trial judge erroneously denied his motion for a mistrial.  We review the denial of a mistrial motion for abuse of discretion.  United States v. Torres, 162 F.3d 6, 12 (1st Cir. 1998); United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994).

The pertinent facts are not disputed.  The district court had sustained the appellant's objection to the admission of any evidence of the discovery of a Taser stun gun in the van.  See Fed. R. Evid. 403 (authorizing the court to exclude evidence if its probative value is substantially outweighed by its unfairly

prejudicial effect).  One of the police officers nevertheless let slip a mention of the gun during his trial testimony.

The appellant objected and sought a mistrial.  The district court struck the offending portion of the answer and gave the jury an emphatic curative instruction:  "The stun gun has nothing to do with this case. . . .  So you should not infer that there is anything improper about the presence of the stun gun there because there wasn't, and you should not consider it in your deliberations because it had nothing to do with this case."  Having taken these prophylactic measures, the court refused to declare a mistrial.

The appellant assigns error to this ruling, asserting that no instruction could cure the prejudice inherent in the mere mention of the stun gun.  In his view, that reference, in conjunction with Joy's testimony about the appellant's alleged attempt to flee, inevitably would have led the jury to believe that the appellant harbored a propensity for violence.  The district court rejected this hypothesis.  So do we.

When a witness strays into forbidden territory, the usual remedy is to strike the wayward remark and instruct the jury to disregard it.  See, e.g., United States v. Bradshaw, 281 F.3d 278, 284 (1st Cir. 2002); Pierro, 32 F.3d at 617.  In all but the rare case, that remedy, if properly executed, will suffice to safeguard the aggrieved party's rights.  Perscrutation of the record

persuades us that this case falls within the general rule, not within the long-odds exception to it. Four factors heavily influence our judgment.

First, the witness's allusion to the stun gun, taken in context, was rather innocuous. Second, the lower court supportably found that the comment was inadvertent. Third, the court's response was swift and pointed. It struck the offending reference and gave a blunt curative instruction on the spot. The appellant did not fault the wording of the instruction at the time and does not do so now. Finally, there is a strong presumption that jurors will follow clear instructions from the presiding judge. See Torres, 162 F.3d at 12; United States v. Sepulveda, 15 F.3d 1161, 1185 (1st Cir. 1993). The record provides us with no basis for doubting that the jury did so here.

In sum, the mention of the stun gun was an isolated incident, and the trial judge — who saw and heard the witness's lapsus linguae at first hand and had an opportunity to evaluate the jury's reaction — concluded that the slip was not particularly consequential. Considering the whole of the record, this conclusion seems eminently reasonable. Apart from sheer speculation, there is nothing to suggest that the unfortunate allusion to the stun gun irretrievably poisoned the well. We hold, therefore, that the district court's decision to eschew a mistrial was well within the encincture of its discretion.

### C. **The Alleged Instructional Error**.

The appellant's remaining claim relates solely to his conviction on count 2 of the indictment. To prove a violation of the statute of conviction, 18 U.S.C. § 1029(a)(3), the government must show that a defendant "knowingly and with intent to defraud possesse[d] fifteen or more . . . counterfeit or unauthorized access devices." In this case, the appellant asked the district court to instruct the jurors that they had to agree on which fifteen devices (i.e., credit cards) were in his possession. The court refused to do so (although it did grant the appellant's request for a supplemental instruction that required jury unanimity as to which cards were unauthorized). The appellant interposed a timely objection, see Fed. R. Crim. P. 30(d), and now assigns error to the trial court's refusal of the desired instruction.

A party's entitlement to a unanimity instruction presents a question of law. Consequently, the district court's answer to that question engenders de novo review. United States v. Pitrone, 115 F.3d 1, 4 (1st Cir. 1997).

The requirement that a federal jury be unanimous is a bedrock principle of our criminal jurisprudence. See Richardson v. United States, 526 U.S. 813, 817 (1999); Schad v. Arizona, 501 U.S. 624, 634 n.5 (1991); see generally United States v. Correa-Ventura, 6 F.3d 1070, 1076-82 (5th Cir. 1993) (providing an extensive discussion of the unanimity requirement). The principle is rooted

-18-

in the Due Process Clause, U.S. Const. amend. V, and memorialized in Fed. R. Crim. P. 31(a).

The unanimity requirement does not impose a rule that all twelve jurors in a federal criminal case must agree on every last detail. Sovereigns define crimes by enumerating their factual elements, and the unanimity requirement attaches to those elements. See Richardson, 526 U.S. at 817; Johnson v. Louisiana, 406 U.S. 356, 369-71 (1972) (Powell, J., concurring). To that extent — and only to that extent — unanimity is an indispensable condition precedent to a conviction. As Justice Blackmun once wrote, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." McKoy v. N. Carolina, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring). Thus, if a jury is confronted with divergent factual theories in support of the same ultimate issue, courts generally have held that the unanimity requirement is met as long as the jurors are in agreement on the ultimate issue (even though they may not be unanimous as to the precise theory). See Richardson, 526 U.S. at 817; Schad, 501 U.S. at 631-32; United States v. Hernandez-Albino, 177 F.3d 33, 40 (1st Cir. 1999).

At this level of generality, the unanimity requirement serves several salutary purposes. For one thing, it helps to

ensure that no defendant will be convicted unless the government has carried its burden of proving guilt beyond a reasonable doubt. See Correa-Ventura, 6 F.3d at 1076-77. For another thing, it functions as a corollary of due process rules against duplicity. See United States v. Verrecchia, 196 F.3d 294, 297 (1st Cir. 1999). Finally, it serves to protect defendants against the vagueness and imprecision that haunt some criminal statutes. See Schad, 501 U.S. at 632-33; United States v. Edmonds, 80 F.3d 810, 819 (3d Cir. 1996).

Withal, the unanimity requirement is more easily stated than applied. The question is one of degree — and the devil is in the details. Due process demands that a jury must come to agreement on the principal facts underlying its verdict — what courts have tended to call the elements of the offense. But that requirement does not extend to subsidiary facts — what the Richardson Court has called "brute facts." Richardson, 526 U.S. at 817-18; accord Schad, 501 U.S. at 632. There is no well defined roadmap to follow in separating the wheat (the elements of an offense) from the chaff (the brute facts that constitute those elements). Rather, we must navigate this course by using guideposts that emanate from "a distillate of the concept of due process with its demands for fundamental fairness." Schad, 501 U.S. at 637.

It is thus apparent that, to resolve this dilemma, an inquiring court must distinguish the elements of a charged offense from the brute facts that constitute those elements, mindful that the unanimity requirement attaches only to the former and not to the latter. Richardson, 526 U.S. at 817-18. This taxonomy has important ramifications for the criminal justice system. On the one hand, requiring unanimity on relatively minor details will hamstring the government's ability to prosecute crimes and encourage hung juries. On the other hand, leaving jurors free to convict despite disagreements about critical facts will imperil the integrity of the reasonable doubt standard.

Against this backdrop, we return to the case at hand. Here, the district court gave a general instruction on unanimity. It required the jury, in effect, to agree that the appellant possessed fifteen or more unauthorized credit cards without requiring agreement as to the identity of those fifteen cards. The pivotal question, therefore, is whether the unanimity requirement extends to which fifteen credit cards the appellant possessed. The answer to this question depends on whether the identity of the credit cards that the appellant possessed is a fact strictly necessary to define the conduct prohibited under the statute of conviction. See Schad, 501 U.S. at 630-31; United States v. Jackson, 879 F.2d 85, 88-89 (3d Cir. 1989). In other words, is the

-21-

identity of the particular fifteen credit cards an element of the offense or merely a fact used to prove an element?[4]

Ascertainment of the level at which unanimity is required in order to convict a defendant of a particular crime tends to be offense-specific. See Richardson, 526 U.S. at 817-18; Correa-Ventura, 6 F.3d at 1081. Thus, a determination of the extent to which jury unanimity is required begins — and sometimes ends — with the text of the statute of conviction. See Richardson, 526 U.S. at 818. Where, as here, the text does not furnish decisive guidance, an inquiring court must comb the statutory language for clues, consider relevant legal traditions, look at the overall structure of the law, examine the statute's legislative history, and mull the implications for unfairness (if any) associated with the absence of a specific unanimity requirement. See id. at 819-20; Schad, 501 U.S. at 637-38.

The preeminent clues that infiltrate the language of 18 U.S.C. § 1029(a)(3) are derived from the statute's narrow compass and its relative specificity. The statute identifies facts necessary to ground a conviction — possession of fifteen or more

---

[4]We emphasize that this question has practical consequences in the circumstances of this case. The jury heard evidence about a total of twenty-two bogus credit cards. These included fourteen credit cards found in the van, four retrieved from He's wallet, and four discovered in the dumpster. The jury supportably could have determined that the appellant actually or constructively possessed any or all of them. Thus, individual jurors might have used different combinations to attribute a figure of fifteen or more cards to the appellant.

counterfeit or unauthorized access devices — with considerable precision and channels jury deliberations within well delineated confines.  These features distinguish section 1029(a)(3) from 21 U.S.C. § 848 (the statute at issue in <u>Richardson</u>).  The latter statute criminalizes the conduct of a continuing criminal enterprise (CCE) and, in so doing, uses as a jumping-off point the commission of any series of included felonies (out of numerous possible choices).

The <u>Richardson</u> Court found that the broad and non-specific nature of section 848 — a statute that lists approximately ninety numbered sections of the federal criminal code as potential serial offenses — engenders an unacceptable risk of juror disagreement as to which series of violations a defendant actually had committed.  526 U.S. at 819.  This risk is magnified because the statute fails to channel jury deliberations toward a specific set of circumstances, thus creating a danger that a jury might convict a defendant unfairly on the basis of his bad reputation alone.  <u>Id.</u>  To allay these risks, the Court imposed a requirement of jury unanimity as to which continuing series of violations a defendant actually committed.  <u>Id.</u> at 824.

Section 1029(a)(3) does not pose either the same type or degree of risk.  While the CCE statute is broad and non-specific, section 1029(a)(3) is narrow and specific.  Its precise account of the facts necessary to ground a conviction means that jurors, even

-23-

without a particularized unanimity instruction, are hardly likely to convict if they cannot reach agreement as to the principal factual elements referable to a given charge. See McKoy, 494 U.S. at 449 n.5 (Blackmun, J., concurring) (collecting cases); cf. Verrecchia, 196 F.3d at 301 (suggesting that when the issue is possession vel non of a specific type of contraband, the potential for juror disagreement is mitigated). Moreover, section 1029(a)(3), unlike the CCE statute, channels jury deliberations toward a particular set of circumstances. A jury dealing with such a statute is unlikely to convict out of a belief that the defendant was doing some non-specific (but obviously bad) act.

History and tradition also help to distinguish section 1029(a)(3) from the CCE statute. The term "violation," used in the CCE statute, always has had independent legal significance; thus, whether certain conduct amounts to a violation is a matter that typically requires jury unanimity. See Richardson, 526 U.S. at 818-19; Edmonds, 80 F.3d at 822. In contrast, the phrase "fifteen or more," used in section 1029(a)(3), has no independent legal significance. That phrase simply refers to the nature of the proscribed possession. Consequently, it evokes no similar tradition of jury unanimity.

In these respects, section 1029(a)(3) is very different from the CCE statute. The more apt comparison is between section 1029(a)(3) and 18 U.S.C. § 922(g)(1) (the statute at issue in

-24-

Verrecchia). Section 922(g)(1) criminalizes the possession of "any firearm" by a previously convicted felon. Id. The district court failed to give an instruction requiring jury unanimity as to which firearm the defendant allegedly possessed. Verrecchia, 196 F.3d at 296-97. On plain error review we approved this omission, reasoning that jurors who agreed that the defendant possessed a firearm but disagreed as to which firearm he possessed nonetheless would be unanimous on the relevant element of the offense: possession of "any firearm." Id. at 299. So it is here. Jurors who agreed that the appellant possessed fifteen unauthorized credit cards but disagreed as to which fifteen nonetheless would be unanimous on the relevant element of the offense: possession of "fifteen or more . . . devices." The use of non-specific terms such as "any" or "or more" indicates that Congress's emphasis was not on the identity of the actual items (whether firearms or credit cards), but, rather, on the possession thereof. See id.

An examination of the structure of section 1029 fortifies our belief that the identity of the particular credit cards should not be deemed an element of the offense. That global view leaves a clear impression that Congress intended to target fraudulent access crimes of a particular scope, such as those surpassing certain value thresholds, see, e.g., 18 U.S.C. § 1029(a)(5) (criminalizing the knowing use of one or more access devices, with intent to defraud, in order to receive more than $1,000 in a one-

year period), or those involving technologies fraudulently used to produce or verify access devices, see, e.g., id. § 1029(a)(4) (criminalizing the possession, production, or use of device-making equipment). The graduated penalty provisions of section 1029, see id. § 1029(c), also are consistent with a focus on the scope of the fraudulent conduct.[5] This emphasis on scope indicates that Congress most likely regarded the number of unauthorized credit cards — "fifteen or more" — rather than their identity as the relevant element of the offense. Cf. Verrecchia, 196 F.3d at 299-300 (requiring no unanimity as to which firearm defendant possessed because the statutory focus lies elsewhere).

The strength of this conclusion is not attenuated by the fact that Congress sought to link culpability to both the nature and number of associated devices through extensive definitions as to what constitutes counterfeit or unauthorized devices. See, e.g., 18 U.S.C. § 1029(e)(1)-(3). The statute provides no detail as to how these devices must be possessed. See id. § 1029(e). By the same token, it does not otherwise supply a reason why a jury should be required to agree on exactly which fifteen cards a defendant possessed. These are strong indications that the identity of the credit cards was not meant to be an element of the offense. See Verrecchia, 196 F.3d at 300-01 (undertaking the same

---

[5]This graduated progression based solely on scope is uniform, save for an exception relating to recidivism. See 18 U.S.C. § 1029(c)(1)(B).

type of analysis, and reaching the same conclusion, with respect to the felon-in-possession statute).

The legislative history of section 1029(a) further buttresses our intuition that section 1029 focuses on the scope of the crime of possession as a whole, as opposed to focusing on each act of possession comprised within that whole. Enacted to augment the Consumer Credit Protection Act, 15 U.S.C. § 1644, and the Electronic Funds Transfer Act, id. § 1693n(b), in combating increasingly sophisticated types of fraudulent practices, section 1029 expanded the armamentarium available to federal law enforcement authorities by criminalizing the mere possession of counterfeit or unauthorized access devices. See H.R. Rep. No. 98-894, at 5 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3691; see also Theresa L. Kruk, Annotation, What Constitutes Violation of 18 U.S.C.A. § 1029, Prohibiting Fraud or Related Activity in Connection with Credit Card or Other Credit Access Device, 115 A.L.R. Fed. 213 (1993). Congress incorporated the "fifteen or more" minimum and the $1,000 monetary threshold as jurisdictional elements, presumably in order to ensure that the weight of the federal government would be brought to bear on more sophisticated and larger-scale fraudulent schemes (where federal resources can best supplement state and local law enforcement efforts). See H.R. Rep. 98-894, supra, at 5, reprinted in 1984 U.S.C.C.A.N. at 3691. These factors suggest that the identity of the particular "fifteen

or more" credit cards is not an element of the offense described in section 1029(a)(3), but, rather, encompasses brute facts incident to that offense.

In an endeavor to refute this suggestion, the appellant refers us to a line of cases holding that access devices possessed over different periods of time cannot be aggregated to meet the numerical requirement of section 1029(a)(3). See, e.g., United States v. Powell, 973 F.2d 885, 890 (10th Cir. 1992); United States v. Russell, 908 F.2d 405, 406-07 (8th Cir. 1990). Far from subverting our conclusion, these decisions simply illustrate that the phrase "fifteen or more . . . devices" defines the scope of a single crime; given the indications we have noted, that phrase cannot coherently be read as an attempt to aggregate separate crimes. Thus, Powell and Russell confirm a part of our basic premise: the statute of conviction targets crimes of a certain scope. In other words, the crime defined by 18 U.S.C. § 1029(a)(3) is not fifteen acts of possessing an unauthorized credit card, but, rather, a single act of possession of fifteen such devices.

A comparison of section 1029(a)(3) with other statutes of similar structure bolsters this conclusion. Typically, statutory elements that require a jury to find a specific quantity of a substance or thing do not demand unanimity as to which items make up that quantity. See, e.g., United States v. Kayode, 254 F.3d 204, 214 (D.C. Cir. 2001) (refusing to require unanimity, in a

-28-

prosecution under 18 U.S.C. § 1028(a)(3), as to which five or more identification documents a defendant possessed); United States v. Nicolaou, 180 F.3d 565, 571-72 (4th Cir. 1999) (refusing to require unanimity, in a prosecution under 18 U.S.C. § 1955(b)(1)(ii), as to which five or more persons participated in an illegal gambling business). Indeed, Richardson helps to prove this point. Although the Court demanded unanimity as to which predicate offenses the defendant committed, it suggested that, as to a different aspect of the CCE statute, 21 U.S.C. § 848(c)(2)(A), unanimity might not be required as to which "five or more other persons" the defendant supervised. See Richardson, 526 U.S. at 824. In this regard, the Court noted that the language, breadth, and tradition of the two factual requirements differed significantly. See id.; see also id. at 829 (Kennedy, J., dissenting); United States v. Tarvers, 833 F.2d 1068, 1074-75 (1st Cir. 1987) (holding expressly that, in a prosecution under 21 U.S.C. § 848, unanimity is not required as to the identity of the persons supervised).

Finally, we note that potential juror disagreement on the identity of the credit cards possessed does not risk serious unfairness in contravention of a defendant's constitutional rights. As the structure and legislative history of section 1029 evince, the statute targets fraudulent ventures of a certain size and scope. This emphasis might, in some circumstances, increase the chance of an unfair conviction in the absence of a specific

unanimity requirement. See Richardson, 526 U.S. at 819; Verrrecchia, 196 F.3d at 301. Here, however, the statute's language is very precise as to the factual basis of the proscribed conduct. This precision, in turn, commands consensus on a number of important facts directly linked to the culpability of a defendant's conduct. That feature significantly mitigates the risk of substantial jury disagreement. See United States v. Davis, 306 F.3d 398, 414 (6th Cir. 2002) (refusing to require unanimity on the means by which a defendant violated the aiding and abetting statute, 18 U.S.C. § 2, because of the statute's "finite terms"); Verrecchia, 196 F.3d at 301 (concluding that the precision of 18 U.S.C. § 922(g)(1) reduces the potential for unfairness and, thus, reduces the need for a specific unanimity requirement). Consequently, we do not believe that the absence of a unanimity instruction anent the identity of the devices possessed has adverse implications for the fairness of potential convictions under 18 U.S.C. § 1029(a)(3).

We need go no further. Having completed our canvass of the appropriate points of reference, we conclude that the identity of the particular devices possessed by a defendant is not an element necessary to prove the culpable act of possession under 18 U.S.C. § 1029(a)(3). Accordingly, that statute does not require a jury, as a condition precedent to conviction, to reach unanimous agreement as to which access devices a defendant possessed. It

follows inexorably that the district court did not err in refusing to give the instruction sought by the appellant.

**Affirmed**.