# United States Court of Appeals
## For the First Circuit

No. 03-2735

UNITED STATES OF AMERICA,

Appellee,

v.

COREY PARDUE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. Senior District Judge]

Before

Boudin, Chief Judge,
Torruella and Dyk,* Circuit Judges.

Robert C. Andrews, on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

October 6, 2004

---

* Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendant-appellant Corey Pardue ("Pardue") appeals the district court's denial of his motion to suppress evidence and a motion in limine related to his conviction for violating 18 U.S.C. § 922(g)(9).  For the reasons stated below, we affirm.

## I.

Pardue entered a conditional guilty plea to a one-count indictment charging him with possession of ammunition by a person convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9).[1]  The guilty plea reserved the right to appeal the denial of his motion to suppress the evidence and the grant of the government's motion in limine.

On March 30, 2002, Portland Police Officer Christopher Coyne ("Coyne"), alone in his police cruiser, received a radio report of a 911 call for a domestic disturbance at 27 Veranda Street.  Officer Richard Vogel ("Vogel") testified that he also heard the radio report of a domestic disturbance between Kyra

---

[1]  This statute states in full:

> It shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence to ship or transport in interstate or foreign commerce . . . any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(9).

Pardue and her brother Corey Pardue.  Vogel, who was a more experienced officer than Coyne, knew the Pardue siblings.

During Coyne's ride to 27 Veranda Street, the dispatcher commented that a male was screaming at a female.  In addition, the dispatcher explained that Kyra had complained she was assaulted by her brother, who was described as a white male, 20 or 21 years old, wearing a baseball hat and hooded sweatshirt, and carrying a backpack.  The man had, according to dispatch, thrown a lighter at his sister and left 27 Veranda Street.

Although Coyne did not know either of the Pardue siblings, he recalled that Vogel reported being familiar with them and had suggested that Pardue might be absent without leave from the United States Marine Corps.

Coyne drove towards 27 Veranda Street to serve as back-up for Vogel.  As he reached the intersection of Veranda and Pembroke, Coyne noticed a man fitting the description given by the dispatcher wearing a backpack, walking on Pembroke Street and heading away from Veranda Street.  The man was several hundred feet away from the address given by the dispatcher.  Coyne asked for his name and identification; Pardue gave both.  Asked what was going on, Pardue said that, after getting into an argument with his sister, he left 27 Veranda Street so that nothing would happen.  Coyne did not place Pardue under arrest.  Vogel heard over the radio that Coyne had located Pardue.

-3-

Coyne testified that he took Pardue's backpack, which Pardue had on his person, and put it on the trunk of his police cruiser. Coyne then explained to Pardue that he wanted to conduct a pat-down, in light of the information from the dispatcher that Pardue had been involved in a domestic disturbance. Coyne performed the pat-down; no weapons were revealed. Coyne then asked Pardue to sit in the rear of the police cruiser, but kept the door open. Coyne testified that he searched the backpack without obtaining Pardue's consent because he was concerned about officer safety. Inside the backpack were various items of personal hygiene, paperwork from the Marine Corps, a scope and mounting brackets for a rifle and two boxes of rifle ammunition in a clear case.

Meanwhile, Vogel reached 27 Veranda Street and interviewed Kyra Pardue. According to Kyra, she argued with her brother because Pardue picked up her 17-month-old son and accidentally struck him in the eye with the corner of a toy box. Kyra yelled at her brother to put the boy down. Pardue threw the boy in a pile of dirty laundry. Kyra yelled at her brother to leave. Pardue responded by throwing a lighter at her leg, causing a welt. While Kyra called the police, Pardue threatened her, picked up his belongings and left the house.

Coyne heard Vogel, through the radio, saying that he had spoken to Kyra. Vogel asked that Coyne ride to 27 Veranda Street.

-4-

During the drive, Pardue was in the back of the police cruiser but was not handcuffed.

Once Coyne arrived, he spoke with Vogel regarding Kyra Pardue's accusations. At Vogel's request, Coyne placed Pardue under arrest for domestic assault, explained the charge, handcuffed Pardue, and took him to the Cumberland County Jail. On February 5, 2003, Pardue was indicted for possession of ammunition by a person convicted of misdemeanor domestic violence, 18 U.S.C. § 922(g)(9).

Pardue moved to suppress the items found in his backpack, arguing that they were the product of an unlawful search. After an evidentiary hearing, the district court denied Pardue's motion.

Prior to trial, the government filed a motion in limine to exclude evidence related to Pardue's defense of entrapment by estoppel. Pardue sought to introduce testimony to the effect that a government official had somehow condoned the conduct for which he was convicted. The district court, after a hearing, granted the government's motion. Subsequently, Pardue entered a conditional guilty plea and filed the present appeal.

## II.

### A.  Discovery of the Ammunition

We review a ruling on a motion to suppress under a bifurcated standard. The district court's factual rulings are reviewed for clear error and its legal conclusions are reviewed de novo. United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004).

A determination regarding probable cause is reviewed de novo as it is a mixed question of law and fact. <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 699 (1996).

Pardue's motion to suppress sought to exclude the ammunition which formed the basis of the indictment. The government opposed the motion on three grounds: first, it argued that the initial discovery of the ammunition was incident to a lawful arrest based on probable cause to believe that Pardue had committed an assault; second, that the discovery was part of a lawful <u>Terry</u> stop; and finally, that the ammunition would have inevitably been discovered during an inventory search following Pardue's arrest. The district court held a hearing on the motion. Although it found that the officers did not have probable cause to arrest Pardue until they arrived back at 27 Veranda Street, and thus that the initial discovery of the ammunition was unlawful, the district court denied the motion to suppress because the evidence would inevitably have been discovered. Specifically, the district court found that probable cause to arrest existed once Coyne learned that Pardue had hit his sister in the leg with a lighter and thrown her son on a pile of laundry. At that point, a lawful arrest would have been effectuated and Pardue would have been properly taken into custody. Upon his arrival at the Cumberland County Jail, an inventory of his belongings would have taken place, and the ammunition would have been discovered.

In *Terry* v. *Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Id. at 22. To withstand scrutiny, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" United States v. Sokolow, 490 U.S. 1, 7 (1989)(quoting Terry, 392 U.S. at 27)(internal quotations omitted). In evaluating the validity of a Terry stop, we consider the totality of the circumstances, mindful that "[t]he concept of reasonable suspicion, like probable cause, is not readily, or even usefully, reduced to a neat set of legal rules." Id. 7-8 (quotations and citations omitted).

The stop of Pardue was appropriate and reasonable at its inception. Examining the circumstances leading up to the stop, we recount the relevant facts Coyne knew or could have reasonably inferred when he initially stopped Pardue. He knew that a domestic assault had been committed in the vicinity, that it had been committed by someone whose physical description matched that of the individual he saw, and that the assailant had departed from the scene on foot.

The second inquiry is whether the scope of the investigatory stop was reasonable under the circumstances. United

States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001). While the district court found that the officers had reasonable suspicion to stop Pardue, it held that Coyne did not have a particularized safety concern. Indeed, we note that by the time Coyne searched the backpack, it had already been taken away from Pardue and there was no apparent risk that Pardue could have obtained a weapon or anything else from it. Thus, the district court held, and we agree, that the initial search of the backpack was outside the bounds set by Terry.

The district court also found that Coyne lacked probable cause to arrest Pardue until after he had taken Pardue to 27 Veranda Street and learned that the lighter Pardue threw at his sister had, in fact, hit her.[2] Nevertheless, the district court

---

[2] We disagree with the district court's emphasis on this point. Throwing a lighter at someone is itself an attempted assault under Maine law. See State v. Bridges, 413 A.2d 937, 944 (Me. 1980) ("[T]he actual consummation of bodily injury is not a requisite element . . . of attempted assault."). Thus, Coyne may well have had probable cause to arrest Pardue for attempted assault as soon as he identified Pardue. Although Coyne's testimony at the suppression hearing calls into doubt whether he believed that the information about throwing the lighter amounted to probable cause, the Supreme Court has held that an officer's subjective belief is not dispositive of whether probable cause existed. See Florida v. Royer, 460 U.S. 491, 507 (1983) ("[T]he fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying . . . custody by proving probable cause and hence removing any barrier to relying on . . . consent to search."). Nevertheless, it is unnecessary to determine whether the information available to Coyne alone constituted probable cause, since, as discussed below, the information available after Vogel spoke with Kyra established probable cause under the doctrine of collective police knowledge.

held that, even if Coyne's initial search of Pardue's backpack exceeded the bounds of a <u>Terry</u> search, "[a]s a result of defendant's lawful arrest [at 27 Veranda Street for domestic assault], the ammunition would have inevitably been discovered during the security search at the Cumberland County Jail or when Officer Coyne inventoried the contents of the backpack . . . ." <u>See generally</u> <u>Nix</u> v. <u>Williams</u>, 467 U.S. 431, 447-48 (1984); <u>United States</u> v. <u>Zapata</u>, 18 F.3d 971, 978-79 (1st Cir. 1994).

We have identified a three-part test for applying the inevitable discovery exception:

> first, whether the legal means [are] truly independent; second, whether both the use of the legal means and the discovery by that means are truly inevitable; and, third, whether the application of the inevitable discovery exception either provides an incentive for police misconduct or significantly weakens fourth amendment protection.

<u>United States</u> v. <u>Scott</u>, 270 F.3d 30, 42 (1st Cir. 2001)(quoting <u>United States</u> v. <u>Silvestri</u>, 787 F.2d 736, 744 (1st Cir. 1986)) (internal quotation marks omitted).

In this case, the district court found that the government had met its burden of showing the legal means were truly independent, since the evidence put forth in the suppression hearing established that both the jail and the Portland Police Department had policies that would have led to a search of the backpack after Pardue's lawful arrest for domestic assault. Noting

the district court's finding of no probable cause to arrest Pardue at the site where he was initially stopped, however, appellant argues that his transfer to 27 Veranda Street fell outside the scope of a lawful _Terry_ stop.  Coyne should have released Pardue rather than driving him to 27 Veranda Street, appellant argues, and therefore Pardue's subsequent arrest and the security search of his backpack were not independent of his unlawful detention.

It is not necessary for us to determine whether driving Pardue to 27 Veranda Street exceeded the bounds of a lawful _Terry_ stop.  Even if the transfer in Coyne's police cruiser  constituted a de facto arrest, rather than a lawful component of the _Terry_ stop, probable cause for such arrest existed under the collective police knowledge doctrine.  As we explained in _United States_ v. _Paradis_, 802 F.2d 553, 557 (1st Cir. 1996), "that _the_ arresting officer may have lacked probable cause for the arrest of the suspect does not mean that the arrest is invalid for lack of probable cause.  It is enough that the collective knowledge and information of all the officers involved establishes probable cause for the arrest."  (internal citations omitted) (emphasis in original), _quoted in_ _Sheehy_ v. _Town of Plymouth_, 191 F.3d 15, 19 (1st Cir. 1999).

We review the determination of whether probable cause existed to arrest Pardue without a warrant in light of the totality

of the circumstances.  Illinois v. Gates, 462 U.S. 213, 230-32 (1983); United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003).

> Probable cause exists when the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that defendant had committed or was committing an offense.

United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002) (quoting United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987)(internal quotation marks and brackets omitted)).

While Pardue was being held at Coyne's police car, Vogel had obtained Kyra's account of the altercation.  In light of her assertions that Pardue had thrown her 17-month-old son into a pile of laundry and had thrown a lighter at her leg, causing a welt, coupled with Pardue's description matching the one given by the dispatcher and his presence in the vicinity of the altercation, Vogel correctly determined that probable cause existed to arrest Pardue on a domestic violence charge.  See Lee, 317 F.3d at 32 ("Probable cause often accretes gradually . . . .").  Even if Coyne had not himself established grounds for probable cause, under the circumstances of this case -- where Coyne and Vogel were working in collaboration over the radio to respond to the same emergency call, Vogel had obtained information establishing probable cause, and had instructed Coyne to bring Pardue to 27 Veranda Street -- probable cause to arrest Pardue existed on the basis of the officers'

-11-

collective knowledge.  See Sheehy, 191 F.3d at 19.  Consequently, the security search conducted subsequent to Pardue's arrest at 27 Veranda Street was independent of both the unlawful search of his bag and any arguable violation of the limits on moving suspects during a Terry stop.

We next address whether the search of Pardue's backpack by lawful means, and the discovery of the ammunition thereby, were truly inevitable.  Lawrence LaPointe, a staff sergeant at the Cumberland County Jail who was in charge of intake and booking, testified that it is standard procedure to perform a security check of personal belongings when a person is taken into custody.  He also testified that the policy of the jail is to perform security searches of the personal belongings of any suspect taken into custody in order to locate any possible contraband.  In his testimony, LaPointe stated that there was no possibility that Pardue's backpack would have escaped the search and inventory procedure after his arrest, because LaPointe would have checked it himself regardless of Coyne's search.  It is routine practice to confiscate contraband such as ammunition, according to the staff sergeant.  Thus, the ammunition would have been discovered in the backpack by way of a routine search of personal belongings. Cf. Illinois v. Lafayette, 462 U.S. 640, 645 (1983)(search of backpack is permissible during inventory search);  United States v.

<u>Burnette</u>, 375 F.3d 10, 18 (1st Cir. 2004)(permissible to search bags pursuant to inventory search policy).

In addition, the Portland Police Department would have conducted a standard inventory of the suspect's property for the officers' protection and to safeguard the property. Coyne testified he took the backpack inside the jail when he was going to fill in Pardue's arrest forms. It was considered personal property, not evidence. Pursuant to Portland Police Department policy, Coyne conducted an inventory search of the backpack. He then secured the backpack in a locker. When asked whether the backpack would have remained unsearched at the jail, Coyne said "no chance. Either the [c]ounty would have searched it or I would have searched it." We have previously upheld the validity of these practices, <u>see</u> <u>United States</u> v. <u>Scott</u>, 270 F.3d at 42, as well as the fact that they are independent means of discovery from the tainted search. <u>Id.</u>; <u>see also</u> <u>Colorado</u> v. <u>Bertine</u>, 479 U.S. 367, 369 (1987)(exception to warrant requirement for an inventory search); <u>Zapata</u>, 18 F.3d at 979 n.6. In this case, Pardue's backpack would inevitably have been opened by either the Portland Police Department or the Cumberland County Jail staff sergeant and the ammunition would have been discovered.

Finally, the record suggests that any Fourth Amendment violation was unintentional, and is clear that application of the inevitable discovery doctrine in this case does not create an

-13-

incentive for future police misconduct. See Scott, 270 F.3d at 45 (stating that under the third prong of the inevitable discovery doctrine "a court . . . must bear always in mind the social costs of the exclusionary rule"). Therefore the motion to suppress was properly denied.

## B. Entrapment by Estoppel

Pardue also attempted to put forth in the district court a defense of entrapment by estoppel. The government filed a motion in limine seeking to exclude this defense to the charges.

We review de novo whether a defense is established as a matter of law. United States v. Ellis, 168 F.3d 558, 561 (1st Cir. 1999)(citing United States v. Caron, 64 F.3d 713, 715 (1st Cir. 1995)). "A defense of entrapment by estoppel would require [defendant] to show that he had been told by a government official that his behavior was legal and that he reasonably relied on that advice." United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002) (citing Ellis, 168 F.3d at 561). In addition, defendant would have to show that his prosecution would be unfair given his reasonable reliance. Ellis, 168 F.3d at 561.

In order to establish a prima facie case for entrapment by estoppel, a defendant must put forth an affirmative representation by a government official that his conduct was or would be legal. Id. In this case, Pardue did not produce any evidence that a Marine Corps official told him it was legal to keep

-14-

ammunition in his backpack or on his person. Instead, Pardue proffered evidence that he was given a waiver for his conviction for domestic assault when he joined the Marines in 1998. Thus, he argues, he could not violate § 922(g)(9).

Defendant's argument fails because entrapment by estoppel requires that a government official make an affirmative representation that carrying ammunition would be legal. At the hearing regarding the motion in limine, Pardue indicated that he intended to introduce evidence that while in the Marines he was trained in the use of firearms and weapons and that he believed that because he was authorized to possess weapons while in the Marines, it was legal to do so after his discharge. According to defendant, he could also show that the Marines had waived his domestic violence misdemeanor when he enlisted, implying that he could carry weapons. Defendant has disclosed no affirmative representation from any government official regarding the legality of possessing ammunition in civilian life. He merely assumed, without being told, that he could possess ammunition after his discharge from the Marines. See Bunnell, 280 F.3d at 49-50 (where defendant never claimed government official told him he could possess weapon, entrapment by estoppel is not applicable); Ellis, 168 F.3d at 561 (same). Thus, defendant could not prove as a matter of law that he was entrapped and the defense was properly excluded.

For the reasons stated above, the defendant's conviction is affirmed.

**<u>Affirmed</u>**.