# United States Court of Appeals
## For the First Circuit

No. 11-2356

UNITED STATES,

Appellee,

v.

REGINALD MOUSCARDY,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Howard, Stahl and Lipez,

Circuit Judges.

Elaine Pourinski for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

July 15, 2013

**LIPEZ, Circuit Judge**.  Appellant Reginald Mouscardy was charged with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Mouscardy moved to suppress the firearm, arguing that it was obtained through an illegal search and seizure in violation of the Fourth Amendment.  The district court denied the motion, and the jury convicted Mouscardy of the charged offense.  Mouscardy now appeals the district court's denial of his motion to suppress.  Additionally, he appeals the district court's determination that he is an armed career criminal.

We affirm.

## I.

The facts, as supported by the record, are as follows. On March 11, 2010, at approximately 12:30 p.m., an individual called 911 to report an assault at the corner of Belmont and Ferry Streets on the boundary of Everett and Malden, Massachusetts.  The call was routed to the Everett Police Department.  The caller reported that he saw a "man beating up his girlfriend or his wife," adding that the man was "giving it to her pretty good."  The caller also provided descriptions of the man and the woman.

The 911 dispatcher relayed the information to police officers, describing the incident as a "possible domestic assault in progress" on the corner of Belmont and Ferry Streets.  Everett Police Officer Matthew Cunningham and Sergeant Robert Zaino were the first to respond.  When the officers arrived, they found a man

and a woman who fit the descriptions given by the 911 caller. The man was later determined to be Reginald Mouscardy. Because the officers believed that the alleged assault may have occurred on the Malden side of Belmont Street, Officer Cunningham had Everett dispatch contact Malden Police and request that they respond to the scene.

Due to the nature of the 911 call, the Everett officers separated Mouscardy and the woman in order to see whether they would provide consistent accounts of the alleged incident. Officer Cunningham took Mouscardy around the corner to the Malden side of Belmont Street, where Mouscardy offered that nothing had happened and that there was no problem. Officer Cunningham did not question Mouscardy at this point.

After a brief period -- Officer Cunningham testified that it was two to three minutes after his initial contact with Mouscardy and the woman -- Malden Police Officer Robert Selfridge arrived on the scene. Officer Selfridge first spoke with Sergeant Zaino and the woman, who gave her name as Shannon Agnew. Agnew, who appeared upset, told Officer Selfridge that nothing had happened and that there had been no assault. She indicated that she knew Mouscardy and that she had been in a relationship with him for about three months, but she did not provide his name to the officers. Officer Selfridge testified that his interaction with Sergeant Zaino and Agnew lasted about thirty-five to forty seconds.

Officer Selfridge then went around the corner to interview Mouscardy. Mouscardy had his back against the wall of a building, and Officer Cunningham was to Mouscardy's left. Officer Selfridge first asked Officer Cunningham if Mouscardy had identified himself; Officer Cunningham informed him that Mouscardy refused to give his name. Officer Selfridge then asked Mouscardy for his name or any form of identification numerous times, but Mouscardy refused to comply, simply repeating that nothing had happened.

Mouscardy had grown visibly "agitated and fidgety" by this point, and he had begun "eye-balling" the area. Keeping his right hand in his right jacket pocket, Mouscardy began to circle away from the wall of the building until he was almost standing on the street. Mouscardy's actions and demeanor made Officer Selfridge uncomfortable, and he asked Officer Cunningham if Mouscardy had been patted down. After Officer Cunningham told Officer Selfridge that he had not performed a pat-down, Officer Selfridge informed Mouscardy that he was going to search him for weapons, and asked him to take his right hand out of his jacket pocket. Mouscardy did not comply. Officer Selfridge initiated the pat-down. When his left hand reached Mouscardy's right jacket pocket, Mouscardy removed his right hand from the pocket and struck Officer Selfridge's left hand with enough force to throw it above Officer Selfridge's shoulder. Officer Selfridge then attempted to

return his left hand to Mouscardy's right jacket pocket, and Mouscardy attempted to slap it away again. Officer Selfridge managed to grab the pocket, but Mouscardy then turned away and started to flee. Although the stitching tore slightly, the contents of the pocket remained enclosed and therefore unknown to the officers.

Officers Cunningham and Selfridge gave chase as Mouscardy fled on foot. Officer Selfridge estimated that he was within ten to twelve feet of Mouscardy throughout the pursuit, while Officer Cunningham followed slightly behind. As Mouscardy ran up the driveway of a residence on Rich Street in Everett, Officer Cunningham ran to the right side of the house in an apparent attempt to block Mouscardy's path of escape while Officer Selfridge remained on Mouscardy's heels.

During the chase, Officer Selfridge noticed that Mouscardy was struggling to remove something from his right pocket. Mouscardy managed to successfully remove the object, which he then transferred from his right hand to his left hand. Officer Selfridge observed that the object was a small handgun. In order to alert Officer Cunningham, Officer Selfridge screamed "he's got a gun" as he continued his pursuit. Mouscardy disappeared behind the Rich Street residence, and Officer Selfridge, now knowing that Mouscardy was armed, drew his weapon and maneuvered carefully around the corner of the house, where he observed Mouscardy

-5-

attempting to scale a chain-link fence with the pistol still in hand. Officer Cunningham joined Officer Selfridge in the back yard of the residence.

After several commands from police to drop the gun, Mouscardy finally placed the pistol on top of a green plastic container and walked toward the officers. A struggle ensued when the officers attempted to handcuff Mouscardy pursuant to an arrest, but he was eventually restrained near the basement door of the residence. Officers retrieved the gun, which was determined to be a .32 caliber Beretta. Mouscardy's true identity was discovered when he was booked at the police station.

On March 31, 2010, a grand jury returned an indictment against Mouscardy on a charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mouscardy moved to suppress the gun, arguing that (1) he had been illegally seized after both he and Agnew told officers that no assault had occurred; (2) the pat-down search was unconstitutional; and (3) his flight from the officers could not trigger a reasonable suspicion of criminal activity because it was spurred by the unconstitutional pat-down search. Following an evidentiary hearing, the district court denied the motion. The court found that it did not have to address Mouscardy's arguments, as the gun was discovered through a source independent of the allegedly unconstitutional means: by striking Officer Selfridge during the pat-down, Mouscardy's actions

-6-

violated Massachusetts criminal law, and the officers were therefore justified in chasing and arresting him. The weapon was therefore recovered incident to a lawful arrest. United States v. Mouscardy, No. 10-10100-PBS, 2011 WL 2600550, at *2 (D. Mass. June 28, 2011).

The case proceeded to trial. On July 26, 2011, the jury found Mouscardy guilty. He was sentenced to twenty years in prison as an armed career criminal and five years of supervised release. This timely appeal followed.

## II.

Mouscardy argues that the district court erred in denying his motion to suppress. We review the denial of a motion to suppress for clear error as to findings of fact. United States v. Infante, 701 F.3d 386, 392 (1st Cir. 2012). We review de novo any conclusions of law, as well as the application of law to facts. Id.

Although the district court based its denial on the ground that the weapon was recovered incident to a lawful arrest for striking a police officer, "[w]e may affirm the district court's decision on any ground made manifest in the record." United States v. Hart, 674 F.3d 33, 39 (1st Cir. 2012). Because we find that both the investigatory stop and the pat-frisk were permissible, we need not determine whether the gun was also admissible under the theory used by the district court.

-7-

The Fourth Amendment's protections against "unreasonable searches and seizures" by the government "extend to brief investigatory stops of persons . . . that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002). These "brief investigatory stops" are commonly referred to as Terry stops. See Terry v. Ohio, 392 U.S. 1 (1968). A Terry stop is, in essence, "a brief detention of an individual for questioning based on a police officer's reasonable suspicion that the person is or has been engaged in criminal activity." United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011). Because the temporary detention of an individual constitutes a seizure for Fourth Amendment purposes, a Terry stop is "subject to the constitutional imperative that it must be reasonable under all the circumstances." United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006) (quoting United States v. Romain, 393 F.3d 63, 70-71 (1st Cir. 2004)) (internal quotation mark omitted).

Our review of a Terry stop involves a two-step analysis. First, we ascertain whether the stop was justified at its inception. United States v. Gates, 709 F.3d 58, 62 (1st Cir. 2013). Second, we determine whether the "actions undertaken during the stop [were] reasonably related in scope to the stop itself 'unless the police [had] a basis for expanding their investigation.'" Id. (quoting United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006)).

## A. Initiation of the Stop

Mouscardy maintains that he was illegally seized for Fourth Amendment purposes. In Mouscardy's view, based on the officers' observations at the scene and the statements by Mouscardy and Agnew that no assault had taken place, the police should have determined that there was no evidence of the alleged assault, and Mouscardy should have been allowed to leave.

The facts support a reasonable suspicion for the investigatory stop. Officer Cunningham and Sergeant Zaino did not approach Mouscardy and Agnew on a mere "hunch." See United States v. Sokolow, 490 U.S. 1, 7 (1989) ("The officer . . . [making the Terry stop] must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" (quoting Terry, 392 U.S. at 27)). The officers found Mouscardy and Agnew at the location that the caller had provided no more than a few minutes after the Everett Police Department received the 911 call reporting the assault. In his own recitation of the facts presented before the district court, Mouscardy offers that the 911 caller "described the physical appearances of the male and female involved in the alleged assault. . . . When [the officers] arrived they saw two individuals who matched the description." These facts alone are sufficient to establish that the officers had an objectively reasonable basis for suspecting wrongdoing on the part of Mouscardy. See United States v. Pardue, 385 F.3d 101, 105 (1st

Cir. 2004) (finding stop reasonable at its inception where officer "knew that a domestic assault had been committed in the vicinity, that it had been committed by someone whose physical description matched that of the individual he saw, and that the assailant had departed from the scene on foot").

## B. Scope of the Stop

Having determined that "the officer[s'] actions were justified at their inception," we now consider "whether the officer[s'] subsequent actions were fairly responsive to the emerging tableau." United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001). Mouscardy challenges both the duration of the stop and the legality of the frisk. We consider both arguments in turn.

### 1. Duration of the Stop

Mouscardy argues that the stop was unnecessarily prolonged. While it is true that "[a] lawful Terry stop may . . . metamorphose into an overly prolonged . . . detention (and, thus, become unlawful)," United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003), the length of the stop in this case was not unreasonable.

After separating Mouscardy and Agnew, Officer Cunningham stood with Mouscardy and waited for the arrival of the Malden officers. According to Officer Cunningham, no questioning took place during this time. When Officer Selfridge arrived, he briefly asked Mouscardy questions related to the reported domestic assault and attempted to learn Mouscardy's identity. Officer Cunningham

testified that Officer Selfridge arrived on the scene within two to three minutes of his initial contact with Mouscardy, and that Mouscardy began his flight (and thus effectively ended the Terry stop) "maybe three minutes" after Officer Selfridge arrived. Officer Selfridge's testimony that Mouscardy fled within a minute and a half to three minutes of his arrival supports Officer Cunningham's version of the events.

Based on these facts, it is apparent that the stop was brief. Although not dispositive alone, the relative brevity of the detainment supports the conclusion that Mouscardy's seizure did not exceed the boundaries of a permissible Terry stop. See United States v. Rabbia, 699 F.3d 85, 93 (1st Cir. 2012) (no de facto arrest where suspect was detained for thirty minutes); United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005) (no de facto arrest where suspect was detained for "slightly over 30 minutes"); United States v. Quinn, 815 F.2d 153, 156 (1st Cir. 1987) (no de facto arrest where police interrogated suspect for twenty to twenty-five minutes).

In addition to the overall brevity of the stop, there is no evidence that it was unreasonably prolonged. When assessing the appropriateness of the duration of an investigatory stop, we ask "whether the length of [the] detention was reasonable, considering 'the law enforcement purposes to be served by the stop . . . and whether the police diligently pursued a means of investigation that

was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" United States v. Acosta-Colon, 157 F.3d 9, 20 (1st Cir. 1998) (omission in original) (quoting United States v. McCarthy, 77 F.3d 522, 530 (1st Cir. 1996)); see also United States v. Sharpe, 470 U.S. 675, 686 (1985). Here the officers' purpose for stopping and questioning Mouscardy was to investigate the reported domestic assault. Officer Selfridge testified that as part of investigating such domestic incidents, he identifies the parties in order to determine whether the individuals have any outstanding arrest warrants or restraining orders. It is undeniably both appropriate and important for an officer to take steps to identify the parties involved in a domestic dispute. See Hiibel v. Sixth Judicial Dist. Court of Nev., 542 U.S. 177, 186 (2004) ("Identity may prove particularly important . . . where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."). The "means of investigation" Officer Selfridge used to gain this information could not have been more straightforward: he asked Mouscardy his name. Mouscardy, however, refused to reveal his identity or produce any form of identification. Officer Selfridge asked again, and again Mouscardy refused. Officer Selfridge testified that he

asked Mouscardy to identify himself or produce identification half a dozen times, to no avail.

We have previously held that in evaluating a claim of unreasonable prolongation of an investigative stop, the fact that a suspect's responses to the officer's questions "were evasive and, at times, defiant is relevant in evaluating the scope of the officer['s] conduct." McCarthy, 77 F.3d at 531. Mouscardy's unresponsiveness to Officer Selfridge's reasonable inquiries prevented the officers from completing their investigation more quickly. Mouscardy cannot profit from the delay he himself caused. See Sharpe, 470 U.S. at 688 (rejecting contention that twenty-minute stop was unreasonable where officers acted diligently and the "suspect's actions contribute[d] to the added delay about which he complain[ed]").

**2. The Frisk**

Mouscardy argues that even if the investigatory stop was justified, Officer Selfridge's attempt to conduct a pat-frisk was not. According to Mouscardy, Officer Selfridge initiated the frisk in the absence of a reasonable belief that Mouscardy was armed and dangerous.

As Mouscardy correctly notes, "we have held that a de facto arrest occurs when 'a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest.'" United

-13-

States v. Jones, 700 F.3d 615, 624 (1st Cir. 2012) (quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994)).  However, we have also made clear that "in making this assessment, we . . . must keep in mind that police conducting a Terry stop are entitled to take reasonable measures to protect their own safety and taking such measures does not transform a Terry stop into an arrest."  Id; see also United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011) ("In a world fraught with peril, officer safety must have a place at the forefront of police work."); United States v. Mohamed, 630 F.3d 1, 6 (1st Cir. 2010) (noting that during a Terry stop, "[o]fficers are permitted to take actions to protect their own safety and the safety of others in the area"); United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991) ("[An officer's] concern[] for his own safety is of paramount importance in assessing the appropriateness of the action taken.").  These reasonable measures include "conducting a pat-frisk if under all the circumstances they have 'a particularized and objective basis to suspect the individual ha[s] a weapon.'"  United States v. Dancy, 640 F.3d 455, 461 (1st Cir. 2011) (alteration in original) (quoting Mohamed, 630 F.3d at 6); see also Arizona v. Johnson, 555 U.S. 323, 326-27 (2009) ("[T]o proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.").

Here the facts demonstrate that Officer Selfridge acted reasonably out of a concern for his and the other officers' safety in initiating the frisk. The officers were responding to a report of a man beating a woman in the street. When an officer has a reasonable suspicion that a crime of violence has occurred, "the same information that will support an investigatory stop will without more support a frisk." United States v. Scott, 270 F.3d 30, 41 (1st Cir. 2001) (emphasis added); see also United States v. Sanchez, 519 F.3d 1208, 1211, 1216 (10th Cir. 2008) (holding that police officers reasonably suspected occupant of car might be armed and dangerous based in part on witness report that occupant had just punched a woman in the face). The fact that Mouscardy was suspected to have committed a violent crime is therefore highly relevant in our determination of whether Officer Selfridge's suspicions were reasonable.

Mouscardy's conduct and disposition during the stop also support a finding that the frisk was justified. As discussed above, Mouscardy repeatedly refused to identify himself, see United States v. Campbell, 549 F.3d 364, 372 (6th Cir. 2008) (holding that passenger's failure to provide identification, "possibly to conceal his identity," was factor that could be considered in determining whether pat-down during Terry stop was appropriate), and refused to remove his hand from his pocket despite several requests by Officer Selfridge, see United States v. Dubose, 579 F.3d 117, 122 (1st Cir.

-15-

2009) (suspect's refusal to remove his hand from his pocket was factor supporting officer's reasonable suspicion that suspect was armed and dangerous); United States v. Soares, 521 F.3d 117, 121 (1st Cir. 2008) (suspect's refusal to heed officer's orders to keep his hands visible contributed to officer's reasonable suspicion).[1] Additionally, as the stop progressed, Mouscardy became agitated and nervous, moving around and "eye-balling" the area. Although nervous behavior alone is not sufficient to establish the reasonable suspicion necessary for a pat-frisk, see United States v. McKoy, 428 F.3d 38, 41 (1st Cir. 2005); see also United States v. Spinner, 475 F.3d 356, 360 (D.C. Cir. 2007) ("[T]he suspicion that someone is armed . . . must be based upon something more than his mere nervousness. A person stopped by the police is entitled to be nervous without thereby suggesting he is armed and dangerous . . . ."), such behavior is a relevant factor to be considered along with others in assessing the totality of the circumstances, see United States v. Chaney, 584 F.3d 20, 27 (1st Cir. 2009).[2]

------

[1] Indeed, some circuits have held that a suspect's refusal to remove his hand from his pocket during a valid Terry stop is alone sufficient to justify a protective frisk. See United States v. Cornelius, 391 F.3d 965, 968 (8th Cir. 2004) (frisk justified where suspect placed his hand in his jacket pocket then refused to remove it); United States v. Harris, 313 F.3d 1228, 1236 (10th Cir. 2002) ("When Defendant refused to remove his hands [from his pockets], [the officer] was reasonably justified in believing that Defendant might be armed and dangerous.").

[2] As well as providing support for Officer Selfridge's decision to perform a pat-frisk, Mouscardy's nervous, agitated behavior supported Officer Selfridge's initial requests that

-16-

Accordingly, we conclude that, in light of the totality of the circumstances, Officer Selfridge had a reasonable suspicion that Mouscardy might be armed and dangerous, thus justifying his initiation of the frisk.

## III.

Mouscardy maintains that his Sixth Amendment rights were violated when the district court sentenced him as an armed career criminal because the predicate offenses on which the district court relied are not categorically violent felonies under the Armed Career Criminal Act ("ACCA"), and because the government failed to present documents that support a finding that his predicate offenses were in fact violent. We review de novo whether the convictions upon which the district court relied categorically qualify as ACCA predicate offenses. Hart, 674 F.3d at 40.

To be eligible for an ACCA enhancement, Mouscardy "had to have been convicted of three prior violent felonies, serious drug offenses, or a combination thereof." Id.; see 18 U.S.C. § 924(e)(1). A "violent felony" is defined by the statute as

> any crime punishable by imprisonment for a
> term exceeding one year . . . that --
> (i) has as an element the use,
> attempted use, or threatened use of physical
> force against the person of another; or

___

Mouscardy remove his hand from his pocket. Considering the totality of the circumstances, Officer Selfridge's requests were reasonable and did not impermissibly expand the scope of the stop.

-17-

                    (ii) is burglary, arson, or extortion,
          involves   use   of   explosives,   or   otherwise
          involves   conduct   that   presents   a   serious
          potential   risk   of   physical   injury   to
          another[.]

18 U.S.C. § 924(e)(2)(B).  We have referred to  the first clause as
the "force clause," and the portion of the second clause following
the enumerated offenses as the "residual clause."  Hart, 674 F.3d
at 41.

          "Under either clause, we take a categorical approach in
determining whether a conviction qualifies as an ACCA predicate
offense, meaning we 'consider only the offense's legal definition,
forgoing any inquiry into how the defendant may have committed the
offense.'"  Id. (quoting United States v. Holloway, 630 F.3d 252,
256  (1st  Cir.  2011)).    In  determining  the  offense's  legal
definition,  state  court  constructions  of  the  applicable  state
statutes control.   Id.   If the statutes "subsume[] only ACCA
predicate offenses," we need go no further.  Id. (emphasis added).
However, when a defendant is convicted under a statute that covers
multiple offenses, "a court may look to a restricted set of
documents (e.g., indictment, plea colloquy, jury instructions) to
ascertain which of the multiple offenses served as the offense of
conviction."  Holloway, 630 F.3d at 257.  These documents are known
as "Shepard documents."  Hart, 674 F.3d at 41 (citing Shepard v.
United States, 544 U.S. 13, 26 (2005)).  "If the Shepard documents
prove  inconclusive,  such  that  the  court  cannot  ascertain  the

offense of conviction, the conviction cannot qualify as an ACCA predicate."  Id.

The presentence report classified seven of Mouscardy's prior convictions as ACCA predicates: (1) a 1997 conviction for possession of crack cocaine with intent to distribute and resisting arrest; (2) a 1999 conviction for assault and battery with a dangerous weapon ("ABDW"); (3) a 2000 conviction for assault and battery on a police officer ("ABPO") and resisting arrest; (4) a 2002 conviction for assault with a dangerous weapon (knife) ("ADW"); (5) a 2002 conviction for ABPO and ABDW; (6) a 2003 conviction for ABPO, ADW (knife), and resisting arrest; (7) a 2005 conviction for distribution of crack cocaine.[3]  Mouscardy argues that, because the Massachusetts crime of ABDW can be committed recklessly, it is not a categorically violent felony under the ACCA.  He also urges us to reconsider our prior decisions holding that ABPO and resisting arrest are categorically violent felonies under the ACCA.  Mouscardy relies generally on our opinion in Holloway, where we held that the Massachusetts crime of simple assault and battery was not a categorically violent felony because it can be committed recklessly.  630 F.3d at 262.

---

[3]  At sentencing, there was some dispute as to whether Mouscardy's 2005 conviction for distribution of crack cocaine was final.  The district court declined to consider that conviction in determining whether Mouscardy qualified for the ACCA enhancement, concluding that "[i]t's irrelevant because of the huge numbers of assault and battery with a dangerous weapon [convictions] and the assault and batteries on a police officer."

The law of the circuit doctrine forecloses Mouscardy's challenge. Pursuant to that doctrine, we are "bound by a prior panel decision, absent any intervening authority." United States v. Grupee, 682 F.3d 143, 149 (1st Cir. 2012). In United States v. Hart -- a case decided after Holloway -- we held that a Massachusetts conviction for ABDW categorically applies as a predicate offense under 18 U.S.C. § 924(e)(2)(B)(ii). 674 F.3d at 44, cert. denied, 133 S. Ct. 228 (2012). In United States v. Dancy, another case decided post-Holloway, we held that the Massachusetts crime of ABPO is categorically a violent felony under the ACCA. 640 F.3d at 468-70. Because Mouscardy has failed to identify any supervening authority that would cast doubt on the validity of Hart or Dancy, his challenges to the designation of his ABDW and ABPO convictions as valid ACCA predicates are barred by the law of the circuit doctrine.

Considering only his ABDW and ABPO convictions, Mouscardy has four qualifying predicates, one more than is required for an ACCA enhancement. We therefore conclude that the district court did not err in sentencing Mouscardy as an armed career criminal.[4]

---

[4] Mouscardy devotes a short paragraph in his brief to the argument that the residual clause of the Armed Career Criminal Act should be considered void for vagueness. This argument is plainly foreclosed by Supreme Court precedent and our own. See Sykes v. United States, 131 S. Ct. 2267, 2277 (2011); James v. United States, 550 U.S. 192, 210 n.6 (2007); United States v. Hart, 674 F.3d 33, 41 n.3 (1st Cir. 2012).

-20-

**IV.**

For the foregoing reasons, we <u>affirm</u> Mouscardy's conviction and sentence.

**<u>So ordered</u>**.