# United States Court of Appeals
## For the First Circuit

No. 13-2068

UNITED STATES OF AMERICA,

Appellee,

v.

KENT AWER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before
Thompson, Baldock,* and Selya,
Circuit Judges.

Arza R. Feldman, with whom Feldman and Feldman was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

October 29, 2014

* Of the Tenth Circuit, sitting by designation.

**BALDOCK**, <u>Circuit Judge</u>.

A federal jury convicted Defendant Kent Awer of possessing cocaine base with intent to distribute. He appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. The Facts[1]

### A. The Malibu

In the cool, early morning hours of May 2, 2006, an officer with the East Providence Police Department noticed a Chevy Malibu driving well over the speed limit in Rhode Island. He attempted to pull the car over. The Malibu, however, continued driving for a half-mile and changed lanes without signaling before finally submitting. The officer then approached the vehicle on foot, where he found Dianikqua Johnson behind the wheel, Defendant Kent Awer in the passenger seat, and a Mr. Simmons in the back. Upon questioning, Johnson admitted she did not have a driver's license. At the same time, Defendant leaned over Johnson and told the officer he had rented the car and they were traveling from New York City; he also produced the rental agreement. Another officer soon arrived, after which the officers arrested Johnson for being an unlicensed driver.

---

[1] We present the facts pertaining to pre-trial evidentiary rulings, such as suppression, in the light most favorable to the district court. <u>See</u> <u>United States</u> v. <u>Oquendo-Rivas</u>, 750 F.3d 12, 16 (1st Cir. 2014). Because sufficiency of the trial evidence is not contested, we present a more neutral description of trial facts. <u>See</u> <u>United States</u> v. <u>Powers</u>, 702 F.3d 1, 4 (1st Cir. 2012).

While securing Johnson, the two officers noticed Defendant moving suspiciously back in the Malibu.[2] As a result, the officers converged on the car's passenger side to investigate. The officer who stopped the car observed Defendant sweating and breathing heavily, so he asked Defendant to exit the car. Defendant reached for the center console instead, prompting the officer to grab his hand and pull him from the car. Moments later, Defendant admitted he had marijuana in his pocket. An officer found it and arrested Defendant. In all, only three minutes or so passed between the initial stop and Defendant's arrest.

That left Simmons, who did not have a driver's license, either. Moreover, the Malibu's rental agreement prohibited a third party from driving. Thus, the officers requested a tow truck for the Malibu. The officers searched the car before having it towed away. During this inventory search, the officers found over 500 grams of cocaine inside an unlocked bag in the trunk. The bag also contained men's clothes and documents bearing Defendant's name. Defendant was later indicted in the District of Rhode Island for

---

[2] At a suppression hearing, one officer testified Defendant was "moving around in the passenger compartment" and "you could see his shoulders moving from side to side." The other officer testified Defendant "kept looking back at us, kept moving around the vehicle. . . . He was bending over forward. He was turning to the left, turning to the right, and it appeared to me at the time that either he was trying to conceal something or . . . retrieve something." At trial, the latter officer testified Defendant "kept looking back towards us. . . . He kept looking around. He kept making movements to his left and right and kept bending over." This will come into play later.

possessing with intent to distribute 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1).

**B. The Driver**

After her arrest, Johnson was placed in a police station holding cell. That same day, an attorney visited her. Johnson told this attorney <u>she</u> was responsible for the cocaine in the Malibu, not Defendant. The attorney advised Johnson to exercise her right not to incriminate herself. Johnson's silence, the attorney said, would be helpful for future plea negotiations. Throughout her time in prison, however, Johnson openly inculpated herself numerous times, both with handwritten statements and in conversations with fellow inmates. Her first handwritten statement, which a Rhode Island Department of Corrections lieutenant notarized on June 25, 2006, reads as follows:

> To the honorable Court's
>
> I Dianikqua Johnson would like to speak on my behalf. I Dianikqua Johnson want to notify Providence Superior Court I take sole Responsibility of this charge I am being charge with (manufacturing/possessing/delivery of cocaine.) Mr. Simmons and Mr. Awer that's Being charge with me had no knowledge of my criminal activity. I also would like to thank the courts for taking time out to listen to this matter
>
> > Truthfully
> > yours
> > Dianikqua Johnson

Her second statement, which was not notarized or dated, reads:

> I Dianikqua Johnson, would like to make a statement on my behalf. The charges I am being charge with Mr. Awer and Mr. Simmons I take full Responsibility of those charges. I acted alone. They didn't have no knowledge of my criminal activity.
>
> On May 01, 2006, I called Mr. Awer to make sure he could give me a ride to Mass. He stated that he will give me a Ride. And would I Be able to drive Because he's Real tierd. I told him yes. This was around 8 pm. 15 minutes later he call to let me know he was downstairs in the parking lot of my grandmother projects (tompkins).
>
> When I Reached the car Awer was already Relaxing in the passenger seat. I put my bags down by the trunk and I walk over to the driver side to open the door so I can pop the trunck on the car key chain. While I was at the trunk of the car, I took the packages of drugs were being charge out my hand Bag then put them in Awer's Black Ascot Bag. Because I felt his Bag had more spots to hide the drugs in it and it did. I then got in the car and Mr. Awer told me where to go to pick his friend Mr. Simmons up Before leaving for Mass.
>
> Picked him up on Wilougbie ave at 9 pm. I Got the Drugs from my uncle. Well I stole them; I know we needed the money so I figure instead of my uncle using all of them, I can get rid of some. Sell a little and us a little.

Johnson also repeated her story to a later-appointed attorney. Time and again, Johnson expressed intense worry that Defendant would be held responsible for her actions. She even refused a plea agreement because she feared hurting Defendant.

Tragically, in an apparently unrelated imbroglio, Johnson was murdered before she could appear at Defendant's trial.

## C. The Evidence

Prior to Defendant's trial, the district court declined to suppress the cocaine found in the Malibu's trunk because: (1) Johnson's speeding justified the initial stop, (2) the force used to pull Defendant from the car was reasonable and did not transform the encounter into a de facto arrest, and (3) the officers' decision to impound the Malibu was reasonable. See United States v. Awer, CR. No. 06-061S, 2007 WL 172258 (D.R.I. Jan. 23, 2007).

Later, the district court admitted Johnson's handwritten statements under Fed. R. Evid. 804(b)(3), which allows for introduction of certain statements against criminal interest.[3] The court excluded testimony from Johnson's two lawyers, however, because her statements to them were not against her criminal interest at the time she made them. The court also held this testimony was not admissible under the Rule 807 "residual" hearsay exception because it would be "merely cumulative." See United States v. Awer, 502 F. Supp. 2d 273 (D.R.I. 2007).

## D. The Trial

Defendant's trial lasted two days. Near the beginning, the district court told the jurors, among other things, that "statements, arguments, and questions by lawyers are not evidence"

---

[3] In its order, the district court repeatedly referred to the admissibility of Johnson's written "statement," singular. That said, both of the above written statements were admitted at trial.

and that they should disregard any statement or item of evidence if the court instructed them to do so.

The Government called a number of East Providence police officers to testify, including two officers who interviewed Defendant at the police station on the day of his arrest. Both officers testified they recited Defendant's constitutional rights to him, and Defendant affirmed he understood these rights. Afterward, they testified, Defendant said he purchased the cocaine in New York City. He then gave a few details about his cocaine supplier and methods before ending the interview, according to the officers. On cross-examination, the officers conceded they had not recorded the interview, handwritten notes from the encounter did not mention Defendant admitting to possession of the cocaine, and Defendant had never in writing waived his rights or claimed possession of the cocaine (although they still maintained he had done so verbally).

Another East Providence officer testified last for the Government, as an expert witness. On direct examination, he said one method drug dealers use to avoid detection is to "have females and children in the car." On cross-examination, he conceded police did not fingerprint any of the items seized from Defendant's car. On re-direct, the prosecutor asked him why no fingerprints were taken. The officer responded, "We had the Defendant rented the vehicle, the drugs were found in his bag with his paperwork and

information, and he gave a confession." Defense counsel immediately objected to the term "confession." The court promptly instructed the jurors to disregard that term, as they (and not the witness) were the ultimate deciders of how to characterize Defendant's statements at the police station.

The prosecutor was then allowed to ask anew about why fingerprints were not sought. This time, the officer responded:

> The different factors regarding the evidence.
> The Defendant, the rental car was in the
> Defendant's name, the drugs were found in his
> bag with male's clothing and items of
> paperwork in his name. The probability--also,
> the statement that was given. The probability
> of finding fingerprints in the hundreds of
> drug cases I've been involved in, we've gotten
> fingerprints four times. The factors I named
> beforehand, that's what we would call a slam-
> dunk in the narcotic investigation world. So
> we didn't fingerprint.

Defense counsel again quickly objected, this time to "slam-dunk." The court promptly told the jury to disregard that term, as well.

Moments later, after the prosecution had rested, Defendant moved for a mistrial. Defense counsel contended "slam-dunk" was "an extremely inappropriate and extremely prejudicial comment," especially coming from an expert, and "a bell like that cannot be unrung" with a cautionary instruction. In response, the Government observed Defendant had broached the fingerprint issue, and it argued a curative instruction would suffice. The court, describing the comment as "very unfortunate and inappropriate," requested overnight briefing on the mistrial question because "I

-8-

don't know whether an instruction is going to be sufficient." In the interim, the court again instructed the jury "to disregard that statement, and disregard the view of [the officer] that the case was a so-called slam-dunk." The court then reiterated the jury's role and concluded by emphasizing that the remark "should have no bearing on your deliberations in this matter."

The next morning, the court denied the mistrial motion, relying on precedent indicating that prompt curative instructions can satisfactorily ameliorate the impact of improper testimony in all but the most prejudicial of circumstances. See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1184-85 (1st Cir. 1993). Here, the court noted, mistrial was not appropriate because "this jury is a sophisticated jury," the comment was "random," and the comment could cut against the Government because the jury might view it as an illegitimate attempt to "shore up" a flawed investigation process. "The bottom line," the court stated, "is I think this has been a very fair trial all the way through . . . ."

For his defense, Defendant introduced Johnson's handwritten statements and the testimony of one of Johnson's cellmates and the officer who notarized her first statement. The cellmate testified she and Johnson were friends and she "thought [Johnson] was honest." She also testified Johnson was often emotional and upset, and Johnson had asked her for advice about how

to deal with a distressing situation.  According to the cellmate, she advised Johnson to make a notarized statement on the subject.

During closing arguments, the prosecutor told the jurors they had learned, from the officer's expert testimony, "that a good way to transport drugs is to put a woman in the car, have a woman driving the drugs."  After the prosecutor finished closing, defense counsel objected to this remark.  The court informed the prosecutor she had indeed misstated the expert's testimony: "What he testified to was it's a common tactic to have a female and children in the car," the court emphasized, "not driving the car.  So this has to be corrected."  Defense counsel quickly moved for a mistrial, which the court just as quickly denied.  The court then explained to the jury how the prosecutor had misstated the expert's testimony.

Before dismissing the jury to deliberate, the court again gave instructions on the expert's objected-to statements:

> Now, I want to remind you at this point that an expert witness or any witness, for that matter, is not entitled to give an opinion on the overall strength of the Government's case.  No witness is entitled to express such an opinion.  That is the jury's job.  And you'll recall that this is why during the course of the trial I instructed you to disregard a statement made by [the expert] in which he expressed an opinion about the strength of the case.  I gave you an explicit instruction to disregard that opinion and I struck his testimony. . . .
>
> By sustaining the objection, I've determined that the evidence should not be considered by you.  And if I struck testimony that was

stated by the witness, you are to disregard it. . . .

Now, you heard evidence in this case that Kent Awer, the Defendant, made a statement in which the Government claims he admitted certain facts. It is for you to decide, one, whether Mr. Awer made that statement; and two, if so, how much weight to give it. In making those decisions you should consider all of the evidence about the statement, including the circumstances under which the statement may have been made and any facts or circumstances tending to corroborate or contradict the version of events described in the statement.

The jury ultimately convicted Defendant. A week later, Defendant moved for a new trial based on the expert's and prosecutor's remarks. The court denied this motion. All errors, the court found, were addressed immediately with apt jury instructions, and the statements' impact was negligible. Also, the prosecutor's statement was "clearly not intentional and, if anything, [was] likely the product of the mere 'haste or confusion' that is normal in the hurly-burly of trial." Thus, combined or alone, the errors did not justify a new trial. See United States v. Awer, CR. No. 06-061S, 2007 WL 2206789 (D.R.I. July 30, 2007).

**E. The Aftermath**

Before sentencing, the court (at Defendant's request) continued the case for over five years, in part to allow Defendant to challenge prior convictions that required a life sentence. At long last, on August 16, 2013, the court sentenced Defendant to 20 years in jail. Defendant appealed, raising three issues for us to

decide.  First, he contends the district court erred by failing to suppress the cocaine found in the trunk of his car pursuant to the Fourth Amendment.  Second, he argues the court abused its discretion by excluding the testimony of Johnson's two lawyers. Third, he asserts the court abused its discretion by not declaring a mistrial based on certain statements made at trial.

## II. The Cocaine

Defendant first argues the district court, per the Fourth Amendment, should have suppressed the cocaine found in the Malibu's trunk.  "In reviewing a district court's denial of a motion to suppress, we review the facts 'in the light most favorable to the district court's ruling on the motion, and we review the district court's findings of fact and credibility determinations for clear error.'"  United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011) (citation omitted).  "We review de novo any conclusions of law." United States v. Mouscardy, 722 F.3d 68, 72 (1st Cir. 2013).

The Fourth Amendment enshrines the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Defendant bears the burden of showing a Fourth Amendment violation here, United States v. Werra, 638 F.3d 326, 330 (1st Cir. 2011), and he posits two theories for why the court should have suppressed the cocaine.[4]

_____

[4] In his opening brief, Defendant initially provides only one theory for exclusion--i.e., police de facto arrested him without probable cause.  A closer reading of his briefs, however, also

-12-

## A. Reasonable Suspicion to Investigate Further

Under well-settled law, police can permissibly detain "an automobile and its occupants pending inquiry into a vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009) (referencing Terry v. Ohio, 392 U.S. 1 (1968)). Accordingly, Defendant admits police lawfully stopped his Malibu for speeding. He also concedes police properly arrested Johnson. He only argues police did not have sufficient reasons after Johnson's arrest to justify detaining him any further. The only lawful option available to police after Johnson's arrest, he asserts, was to let him go; as such, the subsequent investigation was an illegal "fishing expedition." The law and the facts belie this contention.

To begin, the Supreme Court has made it perfectly clear that "during a lawful traffic stop an officer may order a passenger out of the car as a precautionary measure, without reasonable suspicion that the passenger poses a safety risk." Brendlin v. California, 551 U.S. 249, 258 (2007) (emphasis added) (citing Maryland v. Wilson, 519 U.S. 408, 414–15 (1997)). Here, we have an undisputedly lawful traffic stop, and we have police ordering Defendant, a passenger, out of the car. Thus, reasonable suspicion was almost certainly not needed in this situation.

---

reveals the reasonable suspicion theory detailed below. Whether Defendant raised this additional theory at trial is unclear; out of an abundance of caution we analyze and dismiss it here.

That said, Defendant contends the initial stop was complete once Johnson was arrested, and reasonable suspicion was therefore essential to continue investigating him. See United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008) ("[R]easonable suspicion of a crime is necessary to extend a traffic stop for investigatory purposes." (emphasis added)); cf. United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998) (Courts must determine "whether the actions undertaken by the officer following the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." (emphasis added)). The record does not support this claim. Only three or so minutes passed--at most--between the Malibu pulling over and Defendant's being ordered out of the car. This strongly suggests, to put it mildly, that the initial stop was ongoing. Moreover, the officers noticed Defendant moving around while they were securing Johnson, not after. Finally, although the record indicates an officer asked Defendant for his driver's license, nothing shows Defendant was able to produce a license.[5] Thus, the initial stop could not have been over, as the officers still had to figure out what to do with the Malibu when they had no licensed or authorized driver on hand.

---

[5] To the contrary, one officer testified if Defendant had produced the license he would have noted this in his report. The officer made no such note, suggesting no license was produced.

Regardless, the officers' telling Defendant to exit the vehicle _was_ reasonable. At least six facts, taken together, point to possible criminal activity on the part of Defendant: (1) the initial violation (traveling well over the speed limit); (2) the subsequent violation (ignoring the order to pull over); (3) Defendant's apparent control of the Malibu (as evidenced by his talking over Johnson and the rental agreement); (4) Defendant's movements while officers were away (suspicious); (5) Defendant's visage when officers returned (heavy breathing and sweating); and (6) the time of day (just past midnight). These facts are sufficient. See, e.g., United States v. Chaney, 584 F.3d 20, 26 (1st Cir. 2009) ("Here, the officer's initial inquiries into Chaney's identity took at most a minute or two and did not measurably extend the duration of the stop. Any additional delay, including that attributable to the records check, was independently warranted by the officer's reasonable suspicion, based on Chaney's implausible answers and nervous demeanor, that Chaney was giving a false name and might be involved in other criminal activity." (emphasis added)). Moreover, these facts distinguish United States v. McKoy, 428 F.3d 38 (1st Cir. 2005), which is the primary case Defendant relies upon. In McKoy, we held a person's nervousness and movement in a car parked in a high-crime area were not enough to justify a Terry frisk. See id. at 41. Although the present situation bears some resemblance to McKoy, unlike McKoy the

-15-

officers here were faced with more than just nervousness and furtive movements in questionable surroundings. Chiefly, they were dealing with a car that had attempted to evade police after being caught speeding, and with a man who appeared to control that car. That pushes this case beyond McKoy.

Defendant attacks these facts on an array of grounds. For starters, he attempts to pawn off the half-mile police evasion on Johnson: "she was the driver" and he was "merely a passenger," he claims, "who had no control over when the vehicle stopped." Thus, according to Defendant, it was clear error for the district court to take police evasion into account when analyzing the decision to investigate him. If true, though, then why did Defendant attempt to monopolize the conversation with the initial officer? And was it not his rental car (as he otherwise steadfastly maintains)? Could not an officer reasonably surmise that if Defendant was doing the talking and in possession of the car then it was quite possible he was also in control of Johnson's driving? We think so.

Defendant also cites the district court's vocal "skepticism" about the officers' testimony. Even if the court was skeptical at hearings--for example, about Defendant's profuse sweating--it resolved these doubts in its written fact findings in favor of the officers. See, e.g., Awer, 2007 WL 172258, at *1 nn.1-2 (finding the officers' testimony credible). Our job is to

-16-

determine whether the court's fact findings and credibility determinations are clearly wrong, not to decide such questions de novo or divine the court's inner thoughts from transcripts of the hearings.

Next, Defendant assails in a mishmash of ways the officers' reliance on his "suspicious" movements. Defendant first protests because the initial officer failed to see any furtive movements from Defendant when he was following the vehicle. This is trivial, however, as a lack of suspicious activity at one instant hardly alters the existence of suspicious behavior at a later instant. What officers <u>did</u> see and rely upon is the crux of the matter.[6] Defendant next contends his movements were not suspicious because he was searching for his license. This is sheer speculation, with no basis in the record. Third, Defendant attempts to distinguish cases allowing police to rely on furtive movements, <u>see</u>, <u>e.g.</u>, <u>Sibron</u> v. <u>New York</u>, 392 U.S. 40, 66-67 (1968) (a suspect's deliberately furtive movements when approached by police officers "are strong indicia of mens rea"), by contending furtiveness requires more than merely moving a shoulder or bending and turning. As detailed above, however, the officers testified Defendant moved his shoulders, moved about the vehicle, kept

---

[6] This same principle squelches a number of other "absence of evidence" objections raised by Defendant (<u>e.g.</u>, Defendant argues it matters that officers didn't see him breathing heavily or sweating when they first approached the vehicle).

looking around, turned left and right, and bent over forward as if he was trying to conceal or retrieve something.  See supra note 1. Thus, even assuming Defendant is correct about the law on this point, his own actions still doom him.  In the end, the district court found these various movements were "suspicious," Awer, 2007 WL 172258 at *1, *4, and we see no basis for clear error.

To recap, even if reasonable suspicion was required-- which it likely was not--the facts here gave officers "at least 'a minimal level of objective justification' for the belief that criminal activity [was] afoot."  Branch, 537 F.3d at 337 (citation omitted).

**B. De Facto Arrest**

Defendant's second argument for why the district court should have suppressed the cocaine is that he was placed under de facto arrest when officers forcibly removed him from the Malibu. This arrest was unlawful, Defendant contends, because the officers lacked probable cause.  Even if probable cause was lacking at this point, however, his removal from the car was not a de facto arrest.

A detention becomes a de facto arrest when "'a reasonable person in the suspect's position would have understood his situation' . . . to be tantamount to being under arrest." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).  "But . . . the mere presence of arrest-like features is not fatal to the validity

of a particular stop." United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011).  Even a significant use of force, if proportional to the circumstances, does not transform a brief detention to a de facto arrest requiring probable cause.  See id.

Again, "the [Supreme] Court has held that officers may order the driver and any passengers to get out of the car until the traffic stop is complete."  United States v. Fernandez, 600 F.3d 56, 59 (1st Cir. 2010) (citing Maryland, 519 U.S. at 415). Furthermore, we have held that when a "defendant refused to accede to [an officer's] request [to exit a vehicle], the officers were constitutionally entitled to remove him from the vehicle . . . ." United States v. Ruidíaz, 529 F.3d 25, 33 (1st Cir. 2008).  We explained above that the officers lawfully ordered Defendant to exit his rental car.  And, as the district court astutely observed, the right to order a passenger out of a vehicle would be a hollow one indeed if police could not use a reasonable amount of force to ensure compliance with such an order.  Thus, force was proper here.

To the extent Defendant claims the force was excessive under the circumstances, we cannot agree.  The district court found that, rather than cooperate with the order to get out of the car, Defendant instead "made a fast motion towards his left side and the center console area."  Awer, 2007 WL 172258, at *1.  The officer, according to the court, then "used just enough force" to pull defendant from the car.  Id. at *4.  We see no basis for clear

error on these points. Defendant asserts he was "violently extracted" from the car. But the amount of "violence" used was plainly reasonable given Defendant's actions. See United States v. Carrigan, 724 F.3d 39, 47–48 (1st Cir. 2013) (no de facto arrest where two officers "took physical control" of the suspect, put him on the ground on his stomach, and handcuffed him because they "had a reasonable belief that such measures were necessary to protect their own safety"). As such, this force did not transform an otherwise lawful interaction into a de facto arrest. See Pontoo, 666 F.3d at 31. Accordingly, we affirm the district court's denial of the motion to suppress.

### III. Johnson's Lawyers

Defendant next argues the district court abused its discretion by not allowing Johnson's attorneys to testify about her statements claiming responsibility for the drugs. This evidence, he contends, should have been admitted under either Rule 804(b)(3) or Rule 807 of the Federal Rules of Evidence. "We review the district court's evidentiary rulings for abuse of discretion." United States v. Mojica-Baez, 229 F.3d 292, 300 (1st Cir. 2000).

### A. Rule 804(b)(3)

Hearsay is a declarant's out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. With certain exceptions, hearsay is not admissible in federal court. Fed. R. Evid. 802. One exception is Rule 804(b)(3), under

which hearsay is admissible if the declarant is unavailable to testify, and the statement--when made--would have tended to expose the declarant to criminal liability (among other requirements not in dispute). We look at all surrounding circumstances to determine whether a statement was against a declarant's criminal interest. See United States v. Pelletier, 666 F.3d 1, 8 (1st Cir. 2011).

The district court found Johnson's statements to her attorneys could not come in under Rule 804(b)(3) because they would not have exposed her to criminal liability. We agree. The limited case law on point counsels for exclusion, and logically so. See, e.g., Revels v. Diguglielmo, No. Civ.A. 03-5412, 2005 WL 1677951, at *7 (E.D. Penn. July 18, 2005) (unpublished) (state court "correctly held that . . . Mr. Perrin's communications with his lawyer . . . were protected by attorney-client privilege and therefore not against his penal interest"); People v. Johnson, 482 N.Y.S.2d 188, 189 (N.Y. App. Div. 1984) ("[A] statement made to an attorney is confidential and, therefore, not adverse to one's penal interest . . . ."). Indeed, the primary case relied upon by Defendant, Morales v. Portuondo, 154 F. Supp. 2d 706 (S.D.N.Y. 2001), actually counsels against his position on Rule 804(b)(3). In Morales a man named Fornes confessed guilt to an attorney named Servino, and the court found this confession was against Fornes' penal interest. Id. at 712, 725—26. But Servino was not Fornes' attorney; rather, he represented Morales, who was charged with the

crime to which Fornes confessed. Id. at 712. In short, no confidentiality or privilege was in play because Fornes "believed [Servino] would take the information to the prosecuting authorities." Id. at 726. Furthermore, Fornes confessed to another attorney (named Cohen) and the court found this confession was not against Fornes' criminal interest because Fornes had sought Cohen out for legal advice and thus "fully expected" that "Cohen would keep his conversations . . . confidential." Id. at 713–14, 726. Again, on Rule 804(b)(3), Morales in no way favors Defendant.

Nevertheless, Defendant puts forth several additional arguments for why Johnson's statements to her attorneys were against her criminal interest. None of them hold water. First, he contends we must take "context" into account, see Williamson v. United States, 512 U.S. 594, 603 (1994) ("[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context."), the pertinent context (according to Defendant) being that Johnson made identical statements to other people that were against her criminal interest. Defendant essentially asks us to adopt a sort of legal osmosis: Johnson made several statements against her criminal interest, so any statement containing the same information was against her criminal interest as well. This is nonsensical, as it would require us to do the very thing Defendant urges us not to do--ignore context. Although Johnson made a number

of similar statements, those made in the context of the attorney-client privilege were simply not against her criminal interest.

Defendant tries a different twist along the same lines. Even if Johnson's statements to her attorneys were confidential, he asserts, her later statements to third parties waived the attorney-client privilege, subjecting her to criminal liability. See In re Keeper of the Records (Grand Jury Subpoena Addressed to XYZ Corp.), 348 F.3d 16, 22 (1st Cir. 2003) ("[T]he attorney-client privilege may be waived . . . . When otherwise privileged communications are disclosed to a third party, the disclosure destroys the confidentiality upon which the privilege is premised."). Defendant did not contend there was a privilege waiver before the district court, however, meaning this argument is, ironically, waived. See Vázquez-Rivera v. Figueroa, 759 F.3d 44, 49 (1st Cir. 2014).

We decline to evade logic and case law. Johnson's statements to her attorneys were not against her criminal interest because, when made, they were confidential and protected by the attorney-client privilege. Thus, the district court correctly found her attorneys' proffered testimony about those statements to be inadmissible under Rule 804(b)(3).

**B. Rule 807**

Another exception to hearsay exclusion is the "Residual Exception," by which hearsay is admissible if: "(1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it

-23-

is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice." Fed. R. Evid. 807(a). In general, "Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances." United States v. Trenkler, 61 F.3d 45, 59 (1st Cir. 1995) (internal quotation marks omitted).

The district court excluded the testimony of Johnson's attorneys under Rule 807(a)'s third element. The attorneys' testimony would have been cumulative rather than more probative, the court found, because it was duplicative of Johnson's own notarized statements. Awer, 502 F. Supp. 2d at 276.

Defendant again relies on Morales to argue for admission. There, after ruling out Rule 804(b)(3), the court admitted Fornes' statements to attorney Cohen under Rule 807, in part because Cohen's testimony was "vital" to Morales' case. Morales, 154 F. Supp. 2d at 726. In line with this, Defendant argues the lawyers' testimony here was vital--i.e., more probative than Johnson's statements. He gives scattered reasons for this purported vitality, which we put into three broad categories: identity, context, and drama. First, identity: Defendant asserts the testimony is more probative because it comes from seasoned lawyers.

Second, context: Defendant contends the attorneys would have testified Johnson: (a) spoke confidentially, bolstering her credibility; (b) told the attorney on the day of her arrest the cocaine was hers, making it unlikely she concocted the story later; (c) talked to both attorneys outside Defendant's presence, decreasing the possibility of coercion; (d) was very emotional and distressed that Defendant was being accused, bolstering her credibility, and (e) told them specifics of how she put the drugs in Defendant's bag without him knowing. Third, drama: Defendant argues the jury would have been more persuaded by live testimony than by "a piece of paper."

Defendant makes a reasonable--albeit flawed--argument.[7] Problem is, a reasonable argument can also be made that a jury would find a detailed handwritten confession far more compelling than a lawyer's third-party account, no matter how much context the lawyer can provide.[8] Likewise, a written account from soon after the incident removes all need to rely on a witness's memory of events long past. Because reasonable minds can disagree on whether

---

[7] To give just one example of a flaw, Defendant's context and drama arguments are undercut by the fact that Johnson's cellmate testified in person, labeled Johnson "honest," and detailed Johnson's distressed emotional state.

[8] The public view of lawyers, after all, is verifiably dismal. See Public Esteem for Military Still High, Pew Research Center (July 11, 2013), http://www.pewforum.org/2013/07/11/public-esteem-for-military-still-high/ ("Among the 10 occupations the survey asked respondents to rate [for contribution to society], lawyers are at the bottom of the list." (emphasis added)).

the attorneys' testimony was vital, the district court's position--that the testimony was not more probative than Johnson's written statements--cannot be an abuse of discretion, especially when Rule 807 is "to be used very rarely" and only in "exceptional circumstances." See United States v. Hughes, 535 F.3d 880, 882–83 (8th Cir. 2008) (district court did not abuse its discretion in declining to admit testimony under Rule 807 in part because "the excluded testimony was cumulative of Hughes's own testimony").

## IV. Improper Statements

Finally, Defendant argues the district court erred by not declaring a mistrial on the basis of three improper statements made at trial: (1) the expert officer's use of the term "confession"; (2) the same expert's "slam-dunk" remark; and (3) the prosecutor's statement that drug dealers use female drivers. We consider de novo whether these statements were actually improper and, if so, whether they were harmful. See United States v. Manor, 633 F.3d 11, 16-17 (1st Cir. 2011). "But we review the judge's decision denying [Defendant's] mistrial and new-trial motions only for 'manifest abuse of discretion.'" Id. at 17 (quoting United States v. Potter, 463 F.3d 9, 22 (1st Cir. 2006)).

Defendant tacitly admits each alleged error would not itself merit a mistrial. Rather, he only contends the district court abused its discretion by not declaring a mistrial based on their cumulative prejudicial effect. We cannot agree.

-26-

In a different context, say, where a defendant's inculpatory statement was entirely excluded, the use of the term "confession" at trial could be devastating. Here, however, two officers testified at trial that Defendant made inculpatory comments to them after his arrest. And 18 U.S.C. § 3501(e) defines a confession as "any self-incriminating statement made or given orally or in writing." Thus, Defendant arguably did make a confession, like the expert stated, as that term is defined in federal statutes. Moreover, defense counsel made clear only the term "confession" was objectionable, <u>not</u> the expert's reference to Defendant's underlying statements.[9] In a scenario such as this, "[t]he use of the word 'confession' without more . . . simply is not 'serious' misconduct, if misconduct at all." <u>United States</u> v. <u>Scott</u>, 267 F.3d 729, 742 (7th Cir. 2001); <u>see</u> <u>also</u> <u>United States</u> v. <u>Goodlow</u>, 105 F.3d 1203, 1207 (8th Cir. 1997) ("Whether a statement given to law enforcement officials should be referred to as a confession . . . appears, at best, to be a question of semantics and not a potential ground for misconduct."). And the court's prompt and accurate instructions suffice to assuage any fair-trial concerns. <u>See</u>, <u>e.g.</u>, <u>Scott</u>, 267 F.3d at 742.

---

[9] Indeed, moments after the "confession" comment, defense counsel did not object when the expert testified one reason police did not look for fingerprints was because of "the <u>statement</u> that was given [by Defendant]." Supp. App'x at 557 (emphasis added).

Similarly, the prosecutor's challenged comment during closing argument was just a slight misstatement of the evidence, and it was swiftly corrected by the court. Again, the expert testified drug dealers often avoid detection by having women in the car, whereas the prosecutor stated they often have women <u>driving</u> the car. This was incorrect and improper, to be sure, but it was hardly harmful given that the officer's original statement was applicable to the situation here--Johnson was <u>in</u> the car, after all--and therefore probably just as damning. <u>See</u> <u>United States</u> v. <u>Dancy</u>, 640 F.3d 455, 463 (1st Cir. 2011)("Any error is harmless if the government shows it is 'highly probable that the error did not influence the verdict.'" (citation omitted)). Also, nothing indicated this misrepresentation was intentional. "This court has consistently held that where the prosecutor unintentionally misstates the evidence during closing argument, a jury instruction ordinarily is sufficient to cure any potential prejudice, particularly where, as here, the instruction was given immediately after the statement." <u>Olszewski</u> v. <u>Spencer</u>, 466 F.3d 47, 60-61 (1st Cir. 2006) (internal quotation marks omitted).

This leaves Defendant's cumulative argument resting almost exclusively on the "slam-dunk" comment. The district court rightly acknowledged this comment was more problematic. As Defendant points out, this case was not a "slam-dunk" given Johnson's claims of sole culpability. That said, the court

immediately and repeatedly admonished the jury to disregard this statement, and we have long presumed juries obey curative instructions. See United States v. Rodriquez, 675 F.3d 48, 63 (1st Cir. 2012); Sepulveda, 15 F.3d at 1184-85. Defendant has provided us with no case where a mistrial was granted based on a similar statement by itself or in conjunction with other more minor improper statements. Trial judges are "best situated to make a battlefield assessment of the impact that a particular piece of improper information may have on a jury." United States v. DiSanto, 86 F.3d 1238, 1248 (1st Cir. 1996) (citation omitted). Here, the district court declined to grant a mistrial because the "slam-dunk" comment was random and could have hurt the prosecution, and because proper instructions were given. We find no manifest abuse of discretion in that decision.

## V. Conclusion

Accordingly, we AFFIRM.